```
 1            IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
 2                    WESTERN DIVISION

 3    UNITED STATES OF AMERICA,   )
                                  )
 4          Plaintiff,            ) Nos. 12-00296-01-CR-W-BCW
                                  ) and  12-00296-01-CR-W-BCW
 5          v.                    ) January, 25, 2013
                                  ) Kansas City, Missouri
 6    JI LI HUANG, and            ) CRIMINAL
      XIAO GUANG QI               )
 7                                )
            Defendants.           )
 8

 9    TRANSCRIPT OF GUILTY PLEA AND SENTENCING PROCEEDINGS
            BEFORE THE HONORABLE BRIAN C. WIMES
10              UNITED STATES DISTRICT JUDGE

11    Proceedings recorded by electronic voice writing
              Transcript produced by computer
12

13                     APPEARANCES

14    For Plaintiff:    MR. BRIAN PATRICK CASEY
                        MR. MATTHEW WOLESKY
15                      Assistant U.S. Attorneys
                        400 E. 9th Street, 5th Floor
16                      Kansas City, Missouri 64106

17    For Defendant     MR. JAMES R. HOBBS
      Ji Li Huang:      WYRSCH, HOBBS, & MIRAKIAN P.C.
18                      1000 Walnut Street - Suite 1600
                        Kansas City, Missouri 64106-2122
19                      (816) 221-0080

20                      MS. YI SUN
                        141 N. Meramec - Suite 201
21                      St. Louis, Missouri 63105
                        (314)863-8887
22

23    For Defendant     MR. WILLIAM BRIAN GADDY
      Xiao Guang Qi:    MR. JERRY WEIS
24                      926 Cherry
                        Kansas City, Missouri 64106
25                      (816)221-8989
                              1
```

<u>January 25, 2013</u>

(Proceedings began at 11:15 AM)

THE COURT:  Good Morning everyone.  Let

the Court call the case.  This is United States of America

versus -- and I'll spell the last name,

X-I-A-O-G-U-A-N-G-Q-I, pronounced Mr. Xiao Guang Qi.  Case

No. 12-00296-02CRW.

         And further the Court will call United States

versus Ji Li Huang.  J-I-L-I-H-U-A-N-G.  Case No.

12-00296-01-CRW.  Can I have parties enter their

appearance for the record, please?

                MR. CASEY:  Brian Casey and Matt Wolesky

appearing on behalf of the United States.  And we are

joined by case agents, Jerry Crabtree and Brice Taylor.

                THE COURT:  Okay.  Thank you.

                MR. HOBBS:  Good morning, Judge.  J.R.

Hobbs and Yi Sun appearing on behalf on Mr. Huang who

appears in person.  Also seated at counsel table is our

paralegal, Dru Colhour.

                THE COURT:  Thank you.

                MR. GADDY:  Good morning, Judge.  Brian

Gaddy and Jerry Weis on behalf of Mr. Qi.

                THE COURT:  Thank you, Counsel.  My

first order of business is to swear in the interrupter at

this time.

                                2

```
 1          JANE HU, being called as an interpreter in the
 2    Spanish language, was duly sworn to translate into the
 3    Spanish language all questions put to the witness, and he
 4    answers of said witness into the English language.
 5               THE COURT:  Thank you.  Well, these
 6    matters were set today for the purpose of Mr. Huang and
 7    Mr. Qi to enter pleas of guilty.  And also I have
 8    previously talked with Counsel, if the Court accepts the
 9    pleas of guilty, that the Court will immediately take up
10    sentencing on both matters.
11          I had talked to Counsel in chambers on how to
12    procedurally, and they talked to the Court how to
13    procedurally proceed today.  It's my intent to do the
14    pleas of Mr. Huang and Mr. Qi together.  The Court will --
15    and this may be for purposes of the interpreter, there are
16    some questions I will address specifically to each
17    defendant, and then there will be some that I can address
18    generally to the defendants.  And I will look to them and
19    I will call their name for them to respond.
20          With that said, I think the best way to go
21    about, I'm trying to see how we can get everyone a
22    microphone.  Normally, I have the pleas take place here at
23    the podium.
24               MR. HOBBS:  We can come up here.
25               MR. CASEY:  And I can stand up here.
                            3
```

```
 1                    MR. HOBBS:  We can share.

 2                    THE COURT:  Is that as far as it

 3    stretches?

 4                    THE CLERK:  Yes.

 5                    THE COURT:  The first order of business

 6    is for Mr. Huang and Mr. Qi that you be sworn in at this

 7    time.  So if you can raise your right hand to be sworn.

 8              JI LI HUANG AND XIAO GUANG QI

 9          Called as a witness on behalf of the COURT, were

10    duly sworn, and testified as follows:

11                    THE COURT:  And what I'll do just to be

12    clear this is a little different taking the pleas

13    together, but Mr. Huang I wanted to let you know, sir,

14    I'll look to you to respond to a question.  And then Mr.

15    Qi, I will look to you to respond to the question.  Okay.

16  BY THE COURT:

17        Q. Now, Mr. Huang, you understand you are now under

18    oath; is that correct?

19        A. (By Mr. Huang) Yes.

20        Q. You understand that, Mr. Qi?

21        A. (By Mr. Qi) Yes.

22        Q. And further you understand if you answer any

23    questions falsely, that answer may be later used against

24    you in a prosecution for making a false statement.  Do you

25    understand that, Mr. Huang?
                              4
```

```
1          A. (By Mr. Huang) Yes.

2          Q. Do you understand that, Mr. Qi?

3          A. (By Mr. Qi) Yes.

4          Q. Okay.  You know what question is coming but, I

5    ask for you to wait until I complete or finish the entire

6    question before you respond.  Okay.

7                    THE COURT:  Mr. Hobbs, I'm going to look

8    to you first for Mr. Huang.  Could you indicate what Mr.

9    Huang is pleading guilty to?

10                   MR. HOBBS:  Yes, Judge.  Mr. Huang is

11   prepared to plead guilty to Count I of the indictment

12   charging him with violating Title 18 U.S.C. § 183285.  In

13   other words, a conspiracy to commit theft of trade

14   secrets.

15                   THE COURT:  Okay.  And what is the range

16   of punishment for that crime?

17                   MR. HOBBS:  Range of punishment by

18   statute is zero to ten years range, no more than a

19   $250,000 dollar fine, a $100 dollar special assessment.

20                   THE COURT:  Okay.  And Mr. Hobbs, I have

21   received, the Court has received a copy of this plea

22   agreement with the United States government.  Have you had

23   the opportunity to discuss this plea agreement with

24   Mr. Huang?

25                   MR. HOBBS:  Yes, Judge.
                              5
```

```
 1                    THE COURT:  And does this plea agreement
 2     represent the entirety of the total of the agreement that
 3     you have with the government?
 4                    MR. HOBBS:  Yes, Judge.
 5                    THE COURT:  And I have here showing Mr.
 6     Huang signing this plea agreement.  Did you witness him
 7     sign this?
 8                    MR. HOBBS:  Yes, sir, this morning.
 9  BY THE COURT:
10          Q. Mr. Huang, same questions to you, sir.  Did you
11     have an opportunity to review, read and discuss this plea
12     agreement with your attorney?
13          A. Yes.
14          Q. And you did so before you signed it?
15          A. Yes.
16          Q. And does this plea agreement represent the
17     entirety or all of the agreement that you have with the
18     government?
19          A. Yes.
20          Q. And have you had adequate time -- strike that.
21     Let me put it to you this way:  Do you have any questions
22     as it to relates to the terms of this agreement?  Or do
23     you understand all the terms of this agreement?
24          A. Yes, I do.
25          Q. Okay.  And this is your signature; is that
```
6

1    correct?  And you signed it on today's date?

2        A. Yes.

3        Q. Okay.  Thank you.

4                    THE COURT:  Mr. Gaddy, let me ask you,

5    sir, what is your client Mr. Qi pleaing guilty to, and

6    what is the range of punishment, sir?

7                    MR. GADDY:  Judge, similar to

8    Mr. Huang's plea agreement, Mr. Qi has agreed to plead

9    guilty to Count I of the indictment, charging a violation

10   of 18 U.S.C.§ 1832(a)(5), which is a conspiracy to commit

11   theft of trade secrets.  Mr. Qi has signed the plea

12   agreement in my presence earlier today.  The range of

13   punishment for this plea is similar to what was stated for

14   Mr. Huang.  The statutory range of punishment is not more

15   than ten years of imprisonment, $250,000 dollar fine and a

16   $100 dollar mandatory special assessment.

17                   THE COURT:  Okay.  And Mr. Gaddy this

18   plea represents the entirety of the agreement that you

19   have with the government?

20                   MR. GADDY:  It does, Judge.

21                   THE COURT:  And you witnessed your

22   client, I have the original here, it appears to be, Mr. Qi

23   who has signed this agreement?

24                   MR. GADDY:  Yes, sir.

25                   THE COURT:  Okay.

                              7

BY THE COURT:

Q. Let me ask you Mr. Qi, sir, have you had the opportunity to read the plea agreement, and to discuss it with your attorney, Mr. Gaddy?

A. Yes.

Q. And does this plea agreement represent the total or the entirety of the agreement that you have with the government?

A. Yes.

Q. And do you understand the terms of the plea agreement?

A. Yes.

Q. Okay. And in fact, you signed that plea agreement today; is that correct?

A. Yes.

Q. Okay. And just so the parties know if at any time that you don't understand the question or I need to rephrase it, please let the Court know. Okay? Is that a yes?

A. (By Mr. Huang) Yes.

A. (By Mr. Qi) Yes.

Q. Okay. Thank you. Let's first start with Mr. Huang. Sir, please state your name for the record?

A. Ji Li Huang.

Q. Sir, what is your date of birth?

8

1          A. August 18th, 1967.

2          Q. That makes you how old, sir?

3          A. 46.

4          Q. Sir, what is your last grade completed in school

5     or your education level?

6          A. 3rd year in high school.

7          Q. Okay.  Sir, do you read or write the English

8     language at all?

9          A. No.

10          Q. Okay.  And in any way do you understand the

11     English language?

12          A. No.

13          Q. Okay.  Mr. Huang, have you taken any alcohol or

14     drugs or medication in the last two days?

15          A. I didn't drink, but I took my medication.

16          Q. What type of medications, sir?

17          A. For my stomach.

18          Q. Okay.  The purpose of that question is to make

19     sure you fully understand why we are here, and what is

20     going on today?

21          A. Yes, I do understand.

22          Q. And that medication wouldn't affect your ability

23     to understand or proceed in anyway what is happening here

24     today; does it?

25          A. It would not.

9

```
 1        Q. Okay.  Sir, have you ever been treated for a
 2   mental disease or defect?
 3        A. No.
 4        Q. Okay.  Do you believe that you are competent to
 5   proceed or move forward here today with this plea and
 6   sentencing?
 7        A. Yes.
 8        Q. Okay.
 9                  THE COURT:  Mr. Hobbs, do you have any
10   reason through defendant's conduct or otherwise to believe
11   he is not competent to proceed?
12                  MR. HOBBS:  No, Judge.
13                  THE COURT:  Okay.  Thank you.
14   BY THE COURT:
15        Q. Mr. Huang, do you understand what is going on
16   here today, sir?
17        A. Yes.
18        Q. And you have had the opportunity to fully discuss
19   with your attorney what you're doing here today?
20        A. Yes.
21        Q. Okay.  In your own words to the best of your
22   ability, tell the Court what you're doing here today, sir?
23        A. To accept a plea of guilty on the charge on
24   attempt of secret trade theft.  And also to accept
25   sentencing from the Judge.
```
                                10

```
 1        Q. Okay.  This might be a good time to take this up.
 2   Now, you understand if the Court accepts this plea
 3   agreement the parties have entered into, if this Court
 4   accepts a binding agreement; do you understand that?
 5        A. I'm sorry.
 6        Q. Do you understand that?  And let me phrase that a
 7   little differently.  The parties, the government and you
 8   have entered into an agreement?
 9        A. Yes.
10        Q. Where you'll have a sentencing range,
11   notwithstanding, a sentencing range of no time
12   incarcerated up to 18 months incarceration; do you
13   understand that?
14        A. Yes, I do.
15        Q. And you'll will be assessed a $250,000 dollar
16   fine?
17        A. Yes.
18        Q. And part of that agreement is too that you will
19   be assessed a $100 dollar special assessment?
20        A. Yes, I do.
21        Q. And the forfeiture of property; do you understand
22   that?
23        A. Yes, I do.
24        Q. Okay.  So it is your desire today to withdraw
25   your plea of not guilty and to enter a plea of guilty; is
```
                                11

```
 1    that correct?

 2         A. Yes.

 3         Q. Okay.  And Mr. Qi, I'm going to turn to you now.

 4    Same questions.  Please state your name for the record,

 5    sir?

 6         A. (By Mr. Qi) Xiao Guang Qi.

 7         Q. And what is your date of birth?

 8         A. December 15th, 1980.

 9         Q. And that makes you how old?

10         A. 32.

11         Q. Sir, what is your education level or what is the

12    last grade of school completed?

13         A. College graduate.

14         Q. Okay.  Now, do you read, write and understand the

15    English language?

16         A. Basic, yes.  I can write too.

17         Q. Okay.  Sir, have you taken any alcohol or drugs

18    or medication in the last two days?

19         A. No.

20         Q. Okay.  Have you ever been treated for a mental

21    disease or defect or seen a psychiatrist or psychologist

22    before, sir?

23         A. No.

24         Q. Do you believe you are competent to proceed here

25    today?
```
                                12

```
 1          A. Yes.

 2          Q. Okay.

 3                    THE COURT:  Mr. Gaddy, do you have any

 4     reason through Mr. Qi's conduct or otherwise to believe

 5     he's not competent?

 6                    MR. GADDY:  No reasons, Judge.  He is

 7     competent.

 8                    THE COURT:  Thank you.

 9     BY THE COURT:

10          Q. Mr. Qi, you understand what is going on here

11     today?

12          A. Yes, sir.

13          Q. And you have had the opportunity to fully discuss

14     with your attorney what you are here for today; is that

15     correct?

16          A. Yes.

17          Q. In your own words tell me what is going to happen

18     today?

19          A. I'm pleading guilty to the charge against me.

20          Q. Okay.  And what is your understanding -- well,

21     let me, why don't I do it this way.  If the Court accepts

22     the plea of guilty, you know, the agreement between the

23     parties, between you and the government, first, is that

24     you be sentenced to time served; do you understand that?

25          A. Yes.
```

                              13

```
 1          Q. And then you wouldn't have no term of supervised
 2    release?
 3          A. Yes.
 4          Q. You would pay a $20,000 dollar fine?
 5          A. Yes.
 6          Q. With a $100 dollar special assessment?
 7          A. Yes.
 8          Q. Okay.
 9                    THE COURT:  And then there would be --
10    and Counsel you may want to help me.  I know it's here.  A
11    timeframe -- maybe you all can direct me to that.  Mr.
12    Gaddy?
13                    MR. GADDY:  Judge, it is in Paragraph 20
14    of the plea agreement.  Paragraph 20 in general terms
15    talks about immigration consequences.
16                    THE COURT:  Okay.
17                    MR. GADDY:  The last paragraph of
18    Paragraph 20 indicates that the defendant stipulates to
19    voluntarily depart for the United States at his own
20    expense within seven days from completion of the hearing.
21    That is a condition of the plea agreement we have with the
22    United States.
23                    THE COURT:  Okay.  Thank you.
24    BY THE COURT:
25          Q. And you understand that is a condition of this
```
14

```
 1    plea agreement, sir?

 2         A. Yes.

 3         Q. Okay.  Because you all are pleading guilty you

 4    have certain rights, and I want to go over those rights

 5    with you.  If you have any questions or you don't

 6    understand, please let the Court know.  And again, with

 7    these questions I will look to you first Mr. Huang, and

 8    then to you Mr. Qi.  You understand that you have the

 9    right to plead not guilty and have a trial by a judge or

10    jury; do you understand that Mr. Huang?

11         A. (By Mr. Huang) Yes.

12         Q. Mr. Qi?

13         A. (By Mr. Qi) Yes.

14         Q. Okay.  Also during that trial you have the right

15    to be represented by effective assistance of counsel; do

16    you understand that Mr. Huang?

17         A. Yes.

18         Q. Mr. Qi?

19         A. Yes.

20         Q. Okay.  You are presumed innocent throughout the

21    trial until a judge or jury finds you guilty; do you

22    understand that Mr. Huang?

23         A. Yes.

24         Q. Mr. Qi?

25         A. Yes.
```

15

1    Q. Okay.  The government has the burden of proving

2    you guilty beyond a reasonable doubt; do you understand

3    that Mr. Huang?

4        A. Yes.

5        Q. Mr. Qi?

6        A. Yes.

7        Q. Okay.  During that trial you would have the right

8    to confront witnesses.  That is the government will bring

9    in witnesses to testify against you and your attorneys

10   would have the right to cross-examine those witnesses; do

11   you understand that Mr. Huang?

12       A. Yes.

13       Q. Mr. Qi?

14       A. Yes.

15       Q. Okay.  You would also have the right to bring in

16   witnesses to testify on your behalf and use the subpoena

17   power or power of the Court to compel or make them appear

18   in your case; do you understand that Mr. Huang?

19       A. Yes.

20       Q. Mr. Qi?

21       A. Yes.

22       Q. You would have the right to testify on your own

23   behalf, but if you chose no one can make you testify and

24   the Jury would be told not to hold your choice not to

25   testify against you.  Do you understand that Mr. Huang?

16

1      A. Yes.

2      Q. Mr. Qi?

3      A. Yes.

4      Q. If you were tried by a jury all twelve jurors

5   must find you guilty beyond a reasonable doubt.  That is

6   known as a unanimous verdict.  Do you understand that

7   Mr. Huang?

8      A. Yes.

9      Q. Mr. Qi?

10     A. Yes.

11     Q. Okay.  Thank you.  Okay.  You both recognize that

12  pursuant to the plea agreement that you are waiving your

13  right to appeal, a finding of guilt, and the sentence

14  except on the grounds of ineffective assistance of counsel

15  or prosecutorial misconduct?  Let me repeat that.  You

16  understand that by virtue of this plea agreement you are

17  waiving your right to appeal a finding of guilt and the

18  sentence except on the grounds of ineffective assistance

19  of counsel, prosecutorial misconduct or an illegal

20  sentence by this Court.  Do you understand that,

21  Mr. Huang?

22     A. I do.  Yes.

23     Q. Mr. Qi?

24     A. Yes.

25     Q. Thank you.  Now, has your attorney discussed

17

1    these rights with you?  And I know they are contained in
2    the plea agreement, Mr. Huang?
3         A. Yes.
4         Q. Mr. Qi?
5         A. Yes.
6         Q. Okay.  You understand that by pleading guilty
7    you're giving up any and all defenses you may have in this
8    case; do you understand that Mr. Huang?
9         A. I'm sorry.
10        Q. By pleading guilty in this case any defense that
11   they may have to the case, they are waiving that by
12   pleading guilty?
13        A. Yes.
14        Q. And you understand that, Mr. Qi?
15        A. Yes.
16        Q. Okay.  And you understand if the Court accepts
17   this plea of guilty, there will not be a trial; do you
18   understand that, Mr. Huang?
19        A. Yes.
20        Q. Mr. Qi?
21        A. Yes.
22        Q. You are pleading guilty because you're guilty; is
23   that correct, Mr. Huang?
24        A. Yes.
25        Q. Mr. Qi?

                                    18

```
 1            A. Yes.

 2            Q. And you're pleading guilty voluntarily; is that

 3       correct, Mr. Huang?

 4            A. Yes.

 5            Q. Mr. Qi?

 6            A. Yes.

 7            Q. And just want to make sure I say your name so

 8       they know that you are responding to me.  And I

 9       understand.

10                 Now, no one has coerced you, forced you or

11       threaten you to plead guilty; have they, Mr. Huang?

12            A. Nobody.

13            Q. Mr. Qi?

14            A. No.

15            Q. And have you had ample time to discuss this case

16       with your attorney, Mr. Huang?

17            A. Yes.

18            Q. Mr. Qi?

19            A. Yes.

20            Q. Do you need anymore time to talk with your

21       attorney, Mr. Huang?

22            A. No.

23            Q. Mr. Qi?

24            A. No.

25            Q. Okay.  Up to this point do you want the Court to
                                   19
```

```
 1   believe and rely on what you have told me, Mr. Huang?
 2         A. Yes.
 3         Q. Mr. Qi?
 4         A. Yes.
 5         Q. Okay.  Do you all have any complaints with your
 6   attorney?  Let me start with you Mr. Huang?
 7         A. No.
 8         Q. Are you satisfied with their services?
 9         A. Very much so.
10         Q. Have they done everything you asked them to do?
11         A. Yes.
12         Q. Have they done anything you didn't want them to
13   do?
14         A. No.
15         Q. Did they talk to you about your case and the
16   evidence that could be presented against you if this case
17   went to trial?
18         A. Yes.
19         Q. Okay.  And you are satisfied with their
20   representation?
21         A. Yes.
22         Q. Okay.  Mr. Qi, I'm going to ask you the same
23   questions.  Do you have any complaints with your attorney,
24   sir?
25         A. No.
```

                                    20

```
 1            Q. Are you satisfied with their services?

 2            A. Yes.

 3            Q. Have they done everything you asked them to do?

 4            A. Yes.

 5            Q. Have they done anything you didn't want them to

 6       do?

 7            A. No.

 8            Q. Have they had the opportunity to talk with you

 9       about the case and the evidence that could be presented

10       against you if this matter went to trial?

11            A. Yes.

12            Q. Okay.  Let me ask both of you.  Mr. Huang, up to

13       this point do you have any questions of the Court?

14            A. No.

15            Q. Mr. Qi, do you have any questions of the Court?

16            A. No.

17            Q. Let's start with you Mr. Huang.  The Court is

18       going to refer to the plea agreement, in particular

19       paragraph number three.  But I'm going to look to Mr.

20       Casey.

21                    THE COURT:  Mr. Casey, does paragraph

22       three fairly and accurately set forth the facts and

23       circumstances of the crimes that they are charged with?

24                    MR. CASEY:  Yes, it does, Your Honor.

25                    THE COURT:  Okay.  Are there any
                              21
```

```
1    additions or changes or supplementation to that paragraph?

2                    MR. CASEY:  No, Your Honor.  Paragraph

3    three fairly sets forth the facts that the United States

4    would prove in trial and it sufficiently covers the

5    elements of the crime.

6                    THE COURT:  Okay.  Let me ask you, Mr.

7    Hobbs.  Have you and your client had adequate time to

8    review paragraph three of the plea agreement?

9                    MR. HOBBS:  Yes.

10                    THE COURT:  Okay.  In reviewing that

11   there aren't any additions, changes, or supplementation

12   that you would like to make to paragraph three, are there?

13                    MR. HOBBS:  No, sir.

14                    THE COURT:  Okay.

15   BY THE COURT:

16        Q. Mr. Huang, have you had the opportunity to go

17   over, read, and review with your attorney the facts and

18   circumstances contained in paragraph three, sir?

19        A. Yes.

20        Q. And sir, are you here today telling the Court

21   that you committed those acts alleged in that paragraph

22   that gave rise to you committing the crime in which you

23   are charged?

24        A. Yes.

25        Q. Okay.
```

22

```
 1                    THE COURT:  Mr. Qi, again, Mr. Casey
 2      looking at Mr. Qi's plea agreement, does paragraph three
 3      fairly and accurately set forth the facts and
 4      circumstances of a crimes in which he is charged with,
 5      sir?
 6                    MR. CASEY:  Yes, Judge, Your Honor.  I
 7      think it is all relevant in respects to the same with Mr.
 8      Huang.  And I think it summarizes the evidence the
 9      government would pursue in trial with regards to this
10      case.
11                    THE COURT:  Okay.  Thank you.  Now, have
12      you had, Mr. Gaddy, adequate time to read and review
13      paragraph three of the plea agreement with your client?
14                    MR. GADDY:  I have judge.
15                    THE COURT:  And do you agree with
16      paragraph three?
17                    MR. GADDY:  We do.
18                    THE COURT:  Okay.
19   BY THE COURT:
20         Q. Mr. Qi, have you had the opportunity to review
21      this paragraph, paragraph three of the plea agreement with
22      Mr. Gaddy?
23         A. Yes.
24         Q. In doing so do you agree that you committed those
25      acts alleged in paragraph three giving rise to the crime
                                23
```

1    in which you are charged, sir?  You committed those acts,

2    would you agree?

3         A. Yes.

4         Q. Okay.  Now, you understand by pleading guilty in

5    this case, if you pick up any charges in the future, this

6    case can be used against you; do you understand that, Mr.

7    Huang?

8         A. Yes.

9         Q. Do you understand that, Mr. Qi?

10        A. Yes.

11        Q. Okay.  My understand -- also you understand I

12   think I know the answer, but Mr. Huang, are you a US

13   citizen?

14        A. No.

15        Q. Mr. Qi, are you a US citizen, sir?

16        A. No.

17        Q. Now, you understand that this plea may result in

18   deportation from the United States or exclusion from the

19   mission to the United States and/or a denial of

20   naturalization; do you understand that, Mr. Huang?

21        A. Yes, I do.

22        Q. Mr. Qi?

23        A. Yes.

24        Q. Knowing that, you still wish to plead guilty?

25        A. (By Mr. Huang) Yes.

                              24

```
 1          A. (By Mr. Qi) Yes.

 2          Q. Okay.  Now, have you understood everything about

 3     this proceeding, Mr. Huang?

 4          A. Yes.

 5          Q. Mr. Qi?

 6          A. Yes.

 7          Q. Do you have any questions of the Court or any

 8     questions of Counsel, Mr. Huang?

 9          A. No.

10          Q. Mr. Qi?

11          A. No.

12          Q. Okay.  Well, how do you plead to the charges, Mr.

13     Huang?

14          A. I plead guilty.  I accept the agreement, and I

15     will accept the sentence from the Court.

16          Q. Okay.  Thank you.  And also, Mr. Qi, how do you

17     plead to this?

18          A. I plead guilty to the charges.  And accept the

19     sentence.

20          Q. All right.  And Mr. Huang, you want this Court to

21     accept your plea of guilty; is that correct?

22          A. Yes.

23          Q. And Mr. Qi, you want this Court to accept your

24     plea of guilty, correct?

25          A. Yes.
```

25

1    Q. And you are pleading guilty for no other reason

2    but for the fact that you are guilty; is that correct, Mr.

3    Huang?

4    A. Yes.

5    Q. Is that correct, Mr. Qi?

6    A. Yes.

7    Q. Okay.  Is there anything the parties want to

8    bring before the Court and make some findings, anything to

9    the Court?

10                    MR. CASEY:  I believe one other matter

11   to be covered is the matter of forfeiture with regard to

12   Mr. Huang?

13                    THE COURT:  Okay.  Did I not bring that

14   up on Mr. Huang?  And I think that was Mr. Qi.  I think I

15   brought it up with Mr. Huang in terms of the plea

16   agreement but -- and I appreciate it.  I don't think I did

17   so with Mr. Qi.  But let me just cover it with both.

18   BY THE COURT:

19       Q. You do recognize as part of this plea agreement

20   that you are to forfeit the property that would identify

21   the allegation of forfeiture; do you understand, that Mr.

22   Huang?

23       A. Yes.

24       Q. And you understand that also, Mr. Qi?

25       A. Yes.

                              26

```
 1                    THE COURT:  Okay.  Is there anything
 2      else?
 3                    MR. CASEY:  Not from the United States,
 4      Your Honor.
 5                    THE COURT:  Anything from Counsel before
 6      I make my findings?
 7                    MR. HOBBS:  No, Judge.
 8                    MR. GADDY:  No, Your Honor.
 9                    THE COURT:  Okay.  The Court accepts the
10      pleas of guilty.  I find that the pleas of guilty are
11      freely and voluntarily made with a full understanding of
12      the nature of the charges and the consequences of the
13      plea.  It is not the result of force, threat or promise
14      apart from the plea agreement itself.  A factual basis for
15      the plea has been made, the Court finds that you all do
16      not suffer from any mental disease or defect, and you are
17      both competent to proceed to trial.
18           Further, the Court will find there is no
19      probable cause to believe you have been inadequately or
20      ineffectively represented by counsel.
21           At this time and the Court is open to
22      suggestions.  I want to make sure we keep the parties --
23      prior to this hearing the parties talked to the Court.
24      There were presentence investigations that were already
25      prepared.  And if there is nothing further with regards to
```

27

1    the plea, it is the Court's intent to move to the

2    sentencing phase at this time.

3            Let me ask Counsel, I know -- let me start with

4    Mr. Hobbs.  You have had the opportunity to see the

5    presentence investigation report?

6                    MR. HOBBS:  Yes.

7                    THE COURT:  And you have had the

8    opportunity to go over that report with Mr. Huang; is that

9    correct?

10                   MR. HOBBS:  Yes.  If I could Judge, just

11   add and for the record at the appropriate time we will

12   amplify our comments regarding the objection to the amount

13   of loss that is reflected in various paragraphs.  That is

14   the only guideline objection and at the appropriate time

15   we're prepared to make further argument in aid of

16   sentencing following the Court's determination as to what

17   the guideline loss is.

18           We are certainly willing to do that after Mr.

19   Qi's sentencing if the Court wants to proceed with Mr. Qi

20   first.

21                   THE COURT:  And that was a question I

22   had, I know there was an issue with respect to -- and I

23   think we talked about it prior to coming out here Mr.

24   Gaddy, with regard to what the government may have

25   requested in terms of the amount of loss.  And then that

                              28

1     changing significantly.

2            I know there is a binding agreement with respect

3     to the sentencing with your client.  Did you want to

4     address in anyway -- I don't know if it is necessary

5     because, because the actual total offense level reflected

6     notwithstanding the fact that the Court is going to rule,

7     still is showing a 20 -- do you have any objection to the

8     presentence investigation report?  Let me start there.

9            MR. GADDY:  Judge, first of all, we have

10    received a copy of the presentence investigation report.

11    I have reviewed it with Mr. Qi on several occasions.  We

12    did lodge an objection to amount of loss.  I don't believe

13    at this time if the Court is inclined to accept the

14    binding plea, we need to litigate the amount of loss on

15    behalf of Mr. Qi.  I made that objection to be out of an

16    abundance of caution.  If the Court would reject the

17    binding plea then we would be in a situation where we

18    would be litigating that issue with Mr. Huang and Mr.

19    Hobbs.

20            THE COURT:  Right.  Okay.  And I was

21    just doublechecking for the Court's perspective.  It is

22    the Court's intent and I believe I stated to accept the

23    binding plea between the parties.  Can I have Counsel

24    approach for a moment?

25            (THEREUPON; Counsel approached the bench and the
                                29

```
 1    following proceedings were held.)

 2                    THE COURT:  I guess my only question is

 3    and for the purpose of the record, arguably you have, you

 4    know, binding, you know, the same plea agreement.  My

 5    question is in terms of offense level of criminal

 6    categories, I still think I need to make a record of that.

 7    Although we have binding just like I am doing there.  I

 8    want to get your guys take.  This is my first time

 9    experiencing this so.  It would seem to me that I still

10    would need to make my record with regard to offense level.

11    Now, I know you objected and you may not want to argue

12    that, but then I'm going to find the offense level what it

13    is.  Do you understand what I'm saying?  Or are there any

14    suggestions?

15                    MR. HOBBS:  If it would help, Judge, I

16    think under pure guideline practice you are correct.

17                    THE COURT:  Yeah.

18                    MR. HOBBS:  If it would help we are

19    prepared to go first and then have Mr. Gaddy add any

20    additional comments, and have you make the finding.

21                    THE COURT:  Yeah.  And I'm open to that.

22    I understand what you were trying to do and have them go

23    first, but it still would seem to me despite that, the

24    fact that I know he is going to do time served and that.

25    I still have to make some type of finding with regard to
                                30
```

```
 1    that.
 2                    MR. CASEY:  In the alternative, Your
 3    Honor, we would agree to just stipulate to, you know, the
 4    amount of loss for the purposes of Mr. Qi, and then allow
 5    you to make the finding and apply the offense level.  If
 6    Mr. Gaddy would, it would probably move us a long quicker.
 7                    THE COURT:  You guys tell me.  Do you
 8    want to --
 9                    MR. GADDY:  Judge to try to save time I
10    was prepared to withdraw our objection, and just accept a
11    ruling.  But I understand what the Court is saying is you
12    may want to revisit that after Mr. Hobbs' presentation.
13                    THE COURT:  Well, what I am saying is
14    this, if in fact I do what you want me to do, and I am, I
15    accept that.  I still have to make some finding with
16    regard to offense level.  Now, if you withdraw that then
17    I'll make my finding as it is.  The question is do you
18    want to argue against that?  You know, making an offense
19    level 27, category one, which is my guideline, 70-87.
20    Now, I know what I'm going to do but --
21                    MR. GADDY:  Dilemma, dilemma.
22                    THE COURT:  That is my question, I mean,
23    obviously after arguments are made with regard to
24    sentencing -- it would seem to me it would be more
25    consistent what my finding would be, would be my finding
                                   31
```

```
1    for your client as well as Mr. Huang.  Because if you guys

2    stipulated to a certain amount than it would seem

3    inconsistent from the government.

4                    MR. GADDY:  Judge, I couldn't agree with

5    you more.  I would just alert the Court that Mr. Hobbs is

6    going to carry the burden if you will on that.  I probably

7    will have very few comments or argument in light of the

8    Court's tentative ruling on the binding plea.

9                    THE COURT:  Yeah.

10                   MR. GADDY:  And that makes the most

11   sense.

12                   THE COURT:  If you want you can make a

13   record to adopt his argument.

14                   MR. GADDY:  Yeah.

15                   THE COURT:  You know, you don't have to

16   say a word.

17                   MR. GADDY:  Yeah.  I think that is

18   probably the easiest.

19                   THE COURT:  I just think that makes this

20   more consistent as opposed to me making kind of these

21   different findings.  So we will do that and go from there.

22                   MR. GADDY:  I agree, Judge.

23                   THE COURT:  All right.  Thank you.

24        (THEREUPON; The proceedings returned to open Court.)

25                   THE COURT:  Well, it's the Court's --
                                  32
```

1    and I know, Mr. Hobbs, you already indicated you have,

2    there is an objection also with regard to the amount of

3    loss.  And you want to make at least a presentation

4    argument to the Court on what you believe the amount of

5    loss should be that would presumably affect the sentencing

6    guidelines.

7         My understanding is, Mr. Gaddy, you object to

8    the amount of loss that was set forth in the presentence

9    investigation report, is that correct?

10                 MR. GADDY:  That is correct, Judge.

11                 THE COURT:  And I know that Mr. Hobbs is

12   going to make the argument for his client, Mr. Huang.  I

13   would suspect your arguments may be similar.  I will allow

14   you after Mr. Hobbs has completed, if you want to add

15   anything additional you can do so.  If you want to adopt

16   his argument for the Court, then I think that is

17   appropriate too in the Court's estimation.

18                 MR. GADDY:  We agree with that, Judge.

19                 THE COURT:  Okay.  With that said I

20   think, Mr. Hobbs, this would be the appropriate time for

21   the Court to entertain argument from your position and the

22   government's position with respect to loss which would

23   affect the guideline range.

24                 MR. HOBBS:  Thank you, Judge.

25                 THE COURT:  Now, we can do this several

                              33

1    ways.  I don't necessarily -- if you want your clients can

2    have a seat at this time and you can present your

3    argument.  However you see fit.

4                    MR. HOBBS:  Thank you, Judge, for your

5    courtesies.  For the record Mr. Huang objects to paragraph

6    76 in the presentence report to the level of enhancement

7    for a lawsuit $2200 to $400 million.  If you turn Judge to

8    the PSR, Ms. Hille has also indicated the parallel

9    recitations in the addendum.  That is to say paragraph 71,

10   76, 80, 84, 106, 115 are all related to the amount of loss

11   so we object to this paragraph.

12                    THE COURT:  Thank you.  Okay.

13                    MR. HOBBS:  And also, Judge, in aid in

14   this argument as the Court knows the parties have filed a

15   sentencing memorandum.  And I've discussed with the

16   Counsel from the government that the parties could freely

17   refer to the exhibits.  I do have courtesy copies of those

18   exhibits that I have tendered to the Court at this time.

19   I have marked as Exhibit 1 those references and the

20   discovery that Mr. Huang's continues to support his

21   decision regarding the loss.  I've also referenced Exhibit

22   2 which is a letter given on behalf of his group and his

23   deposition regarding loss.  And this morning I've

24   discussed with Mr. Casey also joined the Court's attention

25   to what I've just marked as Exhibit 3, and I'll explain

                              34

that in just a moment, is a memorandum of the interview.
And so at this time for purposes of this hearing, I'd
offer Exhibits 1, 2, and 3.

THE COURT:  Okay.  Any objection?

MR. CASEY:  No objection, Your Honor.

THE COURT:  Defense Exhibits 1, 2, and 3
will be admitted.

(THEREUPON, Defense Exhibits 1, 2, and 3 were
entered into evidence by the Court.)

MR. HOBBS:  And I think it's clear,
Judge, that I have rebuttal of Mr. Casey what's referred
to Exhibits that he has tendered from the discovery
procedurally Mr. Huang has no objection to that.

Judge, first, I think it is important to note
that there is no disagreement that this case did not
result in an actual loss.  It was a product based sting
operation, there was no actual harm to Pittsburgh Corning.
That is important because under guidelines one first looks
as to whether there is an ascertainable actual loss.  That
is not disputed.

And then the second issue than becomes what is
the intended loss for guideline purposes.  And we have
advanced in the sentencing memorandum the argument that
Mr. Huang did not intend to cause a significant actual
loss to Pittsburgh Corning.  I would note that one of the

35

```
 1    elements of the trade secrets defense which he plead
 2    guilty is a representation that his acts were knowing that
 3    an injury would occur.  Our guideline argument is a little
 4    more nuanced than that, in this sense, while his actions
 5    involved and knowledge that some injury would've occurred
 6    to Pittsburgh Corning, that is far different than
 7    admitting for guideline purpose that he was intending to
 8    cause a significant loss, certainly in the realm of $260
 9    million dollars.
10          The range that is before the Court would include
11    the Court's consideration as to whether the loss was
12    negligible or in the alternative no more than a $100,000
13    dollars or in the alternative somewhere near the $20
14    million dollar range or in the alternative $260 million
15    dollars.  The reason I deposit that to the Court is to
16    amplify the sentencing memorandum.
17          As Mr. Huang, we believe, had an intention of
18    getting information that would allow him to develop an
19    opportunity in Ningo, China to use FOAMGLAS for commercial
20    buildings.  We believe that the record before the Court
21    and in the sentencing memorandum shows that Pittsburgh
22    Corning was not in business in China.  They were not in
23    business in Ningo, China, and they were not in the
24    commercial building business.  Instead, as the PSR points
25    out, in fact in paragraph 10, Pittsburgh Corning customers
```
                                 36

were energy companies, Petro chemical companies, natural

2   gas facilities involved in piping, tubing, other types of

3   the use of the product.

4           And that is one of the reasons we suggest that

5   the Court could well find that the injury to Pittsburgh

6   Corning is negligible.

7           Now, what is telling about that, Judge, if you

8   look at the indications of the sentencing memorandum is

9   the series of quotations that we have made from the

10  discovery.  And one of the reasons that is important, is

11  this was, as the Court knows, a product of a sting

12  operation.  One of the duties of a sting operation is that

13  the defendants are unaware that they are being recorded.

14  They are unaware that they are being audio recorded or

15  video recording.  The concept is that if you are unaware

16  you are being recorded your answers are more likely than

17  not to be a true reflection of what you are thinking.

18  Obviously, we see that in drug cases all the time.  You

19  talk to somebody to get an indication of whether that was

20  their intent.  We have cited throughout the sentencing

21  memorandum the examples, Judge, of where Mr. Huang, had

22  professed not knowing that he was being recorded that he

23  was not trying to drive Pittsburgh Corning out of

24  business.  In fact, he was not trying to compete with

25  Pittsburgh Corning in the United States.  He had a narrow

                                 37

1   vision or a narrow remark, and that is without getting

2   into a lot of detail.  Exhibit 1 has the references in

3   that regard.  There are suggestions, for example, aren't

4   you going to hurt Pittsburgh Corning?  He replied, no, my

5   intent, my belief is that were going to start an

6   opportunity that would be in a completely different

7   market, both geographically and with respect to the form

8   of the product.  In fact, one of the quotes says, I want

9   to do a different form.

10          So you know, it's interesting, what would the

11  government's argument be had Mr. Huang said he didn't know

12  he was being recorded?  Well, sure, I'm going to drive

13  them out of business, I'm going to eradicate them, I'm

14  going to eliminate them.  Their argument would be, well,

15  the admissions and the undisclosed shows true intent.  We

16  suggests the same is true to the contrary.  That when he

17  is saying what his narrow purpose would be, the Court

18  would be well within it's rights to determine that

19  purpose.

20          Now, alternatively, Judge, we would point out

21  that it is undisputed that Mr. Huang paid $25 000 dollars

22  for the employee from Pittsburgh Corning with a promise to

23  pay an additional $75,000 dollars to come and help him

24  develop this product in Ningo for the use of commercial

25  property.  So there is an alternative argument that the

                              38

gain that he had or the true vision of loss might be the

amount of money that was appropriated.  That is

significant because if the Court adopted that range after

an acceptance of plea of guilty, then that range would be

ten to 16 months as opposed to the more significant ranges

suggested by the government.

The third alternative is if the government

suggests is the $7 to $20 million dollar range.  And they

suggest that there was a representation of Mr. Huang was

going to invest that much to develop this opportunity and

perhaps that is the measure of loss.

And then finally, Pittsburgh Corning itself

suggests a much greater figure than even the parties whom

nearly suggested by suggesting $260 million dollars.  So

let me speak about that as well.

The argument that before the Court with respect

to the $260 million dollar loss, Judge, is primarily

grounded in this Exhibit 2.  I'd like to talk about No. 2

for just a moment.  Let me give you a courtesy copy of

Exhibits 1 and 2, Judge.

THE COURT:  Thank you.

MR. HOBBS:  Exhibit 2 is the so called

victim impact letter.  And for the record we have no

objection to the Court considering this.  I talked to Mr.

Casey by trying to make the hearing effective or efficient

39

1    and certainly even in determination of an issue as

2    significant as this, as long as the information is

3    reliable, the Court can do that.

4              Our suggestion is that when one looks at the

5    letter it's not persuasive as horrendous loss of $260

6    million dollars.  For example, paragraph two, page one of

7    the letter, speaks in terms of potential loss.  Paragraph

8    two, page one, says the current fair market value of the

9    company is $267 to $272 million dollars.  Paragraph two,

10   page one, says it would allow others to perfect cellular

11   glass manufacturing.  Paragraph three, page one of the

12   letter, says in Pittsburgh's Corning belief that it would

13   result in a complete loss of the goodwill value of

14   Pittsburgh's Corning.  Paragraph four, page one, says it

15   would deplete the entire value of the company.  Paragraph

16   four, page one, Pittsburgh's Corning says it has a

17   trademark registration in 55 countries, and sales are made

18   in over 90 counties.  But Pittsburgh is obviously assuming

19   that it was Mr. Huang's intention.  Paragraph seven,

20   speaks to guilt, we are professing not guilty, the Court

21   just heard that.  Paragraph two, page two, Pittsburgh

22   admits it's only a United States producer.  Paragraph

23   three, page three, of this letter says competitors have

24   emerged, yet Pittsburgh Corning still continues to

25   flourish.  Paragraph one, page four of the letter, says

                              40

that thirty percent of the sales is in the Asia-Pacific

region.  This is a telling admission because there is no

mention of China, there is no in Ningo, China, and there's

no mention of the commercial building market.

In addition, Judge, we have marked what has been

marked as Exhibit 3.  And I think it is interesting that

when another representative who had been interviewed about

the before the value of the company, the figure of a $150

to $200 million was used.  I only have one copy of this

and I will show this to Mr. Casey.

THE COURT:  Okay.

MR. HOBBS:  Exhibit 3.  The point being

that it is our respectful position that this letter is a

speculation, pure speculation.  They also note, for

example, that there is these competitors, yet the

discovery is complete with other competitors.  There is a

group called Zhen Shen, that's Z-H-E-N-S-H-E-N.  And yet

that competitor has not eradicated or eliminated the

ability for Pittsburgh Corning to sell it's product.

Additionally, Judge, in the discovery we have

noted that there is confirmation that Pittsburgh Corning

tried to build a factory in China, but they were not

allowed to do that.  They suggest that their Asian market

is 30 percent and that therefore this figure can be

justified, but we argued even that percentage should be

41

1   reduced further because we wanted a more local Chinese

2   market.

3           There is also reference to the discovery that

4   they wanted to go to China at most because there is a

5   representation that Pittsburgh Corning had acknowledge of

6   the existence of over 10,000 liquefied natural gas plants.

7   So there is actually no mention at all of using this

8   FOAMGLAS insulation in a context of commercial buildings

9   or high rise buildings.

10          Now, why is this important?  Because the law on

11  intended loss is what Mr. Huang thought.  What did he

12  think?  It is A subjective analysis.  Now, the

13  government's reply appropriately points out that in

14  fashion loss one can look at research and development.  We

15  have no quarrel with that observation.  But the point is

16  on an intended loss case, it's the defendant's state of

17  mind that drives what the vision of loss should be.  And

18  how do we know that?  Well, one of the leading cases on

19  intended loss is the United States versus Wells.  Which

20  has an interesting history in this District because this

21  case went to the United States Supreme Court and now

22  Whitworth is on the other side of it.  And after the

23  remand by the United States Supreme Court on another

24  issue, when it came for sentencing, this is a reported

25  opinion here, 127 Fed 3739, the case that and that Mr.

                              42

```
 1    Gaddy and well as others from our firm litigated.  It says
 2    that the government claims that intended loss as used in
 3    2F1, which at the time is the equivalent of 2B1 isn't
 4    injured by the potential loss or possible loss that could
 5    rise in the charged crime.  Not by the amount of loss the
 6    defendant intended to cause.  Under this the intended loss
 7    is shorthand for a possible loss that could have resulted.
 8    He goes on to point out that is not -- if the Court
 9    determines that the defendant intends to seek the full
10    extent of the fraud, there is no doubt this defendant
11    intended to cause less than the greatest possible loss,
12    that's what the Court should look at.  The Court should
13    look at what the defendant subjectively wanted to achieve.
14            We also noted that, again, what we have no
15    argument with this procedure in Court taken any proffer of
16    the two.  In the case called United States versus Rivers,
17    the Court should look strongly when the evidence is
18    supportive of guideline loss is the victim's own
19    representations.  And, of course, we pointed out that at
20    least on one occasion they were arguably and persisted in
21    nature to the same question.  And that is the United
22    States versus Rivers.  I've got a copy of this since I
23    didn't put that in the sentencing memorandum.
24            Now, we are not suggesting that what happened
25    was appropriate behavior.  And that is why Mr. Huang has
```
43

plead guilty.  And we are well aware of the elements and
that some injury is the element of the offense.  But
Mr. Huang did not intend to cause a catastrophic measure
of loss that Pittsburgh Corning -- and we suggest even the
$20 million dollar figure by the government suggests.
I've given this analogy, and there may be better
analogies.  But it is sort of like John DeLorean's trading
Delorean Motor car.  It was General Motors.  And I suppose
that General Motors would argue, well, he is going to
drive us out of business.  That wasn't his intent.  His
intent was to set up a rival product.  It turned out to be
fatal.

        The other thing that is interesting about
Pittsburgh Corning is that there is no rare condition that
in order to adequately compete and totally devalue the
company, he'd have to have a startup company, he'd have
costs, employees.  His business, Judge, is one of
promotional products, there toys, there foam balls, and
other products that you see at Bench Bar, and other places
where they give out promotional products.  He wasn't
geared up to suggest that he would go and knock down
Pittsburgh Corning.  $260 million dollars I think is just
too speculative to be persuasive.  So we would ask that
the Court find that the loss is negligible or in the
alternative no more than a $100,000.00 dollars.  I have

                              44

authorities and citations in the order that I feel is

effective, but I will finish in a timely fashion so that

completes the argument at this time.

THE COURT:  Thank you, Mr. Hobbs.  Let

me ask, Mr. Gaddy, is there anything additional that you

want to add to that argument with respect to loss?

MR. GADDY:  Just a brief comment, Judge.

First of all, I would with leave of Court adopt Mr. Hobbs

arguments and authorities that he shared with you today.

THE COURT:  Okay.

MR. GADDY:  One distinguish I think

needs to be made with respect to Mr. Qi is as follows.  He

was an employee in the promotional company that made

squeeze ball, polyurethane toys, and doors.  In our

objection to the PSR we note that Mr. Qi was not involved

in designing this separate new factory on FOAMGLAS.  He

was not involved in the initial contacts with Pittsburgh

Corning.  He was not involved with the facts noted in the

PSR about some folks traveling to the Sedalia factory to

take a tour of it.  He was not involved in the e-mails

with the undercover Sedalia employee.  He was not involved

in advertising for a position in Sedalia, Missouri

newspaper for a Pittsburgh Corning consultant.  Mr. Qi was

tapped, if you will, to come to Kansas City in late August

or early September of 2012 by Mr. Huang to serve as a

45

translator.  As a matter of fact, on that trip in Sedalia

and in the discovery and in the presentence report they

had other business.  They visited some door vendors in

Kansas City.

Mr. Qi, of course, was at the dinner meeting

that brings us all here.  He has accepted responsibility

for being a part of that meeting.  He knows what they did

was wrong in trying to acquire documents that did not

belong to them.  But what is ironic and interesting to me

is because Mr. Qi did not know anything about FOAMGLAS or

insulation, that wasn't his field.  He had no clue who

Pittsburgh Corning was.  He had no clue whether the effort

would be successful or not.  And he had no clue what their

market share was, whether they were in China, what

products they made.  I think in this case when you go

through all the comments that Mr. Hobbs shared that were

made by Mr. Huang, Mr. Huang repeatedly on the tape and

during his FBI interview repeatedly says, I'm not

competing with Pittsburgh Corning, I'm going to be in

China, I'm going to be putting insulation into commercial

buildings, they're in factories.  I think that not only is

that important in Mr. Huang's case, but it's very

important in Mr. Qi's case.  That is his boss.  He is

translating those words.  He's relying on those words that

Mr. Huang is saying that we are going to do something

1  different.

2          So those are the only additional comments I

3  would have on behalf of Mr. Qi.  I do think when you look

4  at his limited role and lack of knowledge of the whole

5  business, his intent, and his heart was his boss was

6  telling him that we are not going to compete with

7  Pittsburgh Corning.  So I think there is grounds in Mr.

8  Qi's case that there can be negligible loss as well.

9  Thank you, Judge.

10                  THE COURT:  Thank you.  Mr. Casey.

11                  MR. CASEY:  Judge, in an initial matter

12  the United States has filed the sentencing memorandum in

13  this case.  We attach those exhibits under seal.  We offer

14  those to the Court for consideration at this time.

15                  THE COURT:  Okay.  They will be accepted

16  for purposes of this hearing.

17                  (THEREUPON; the Court accepted exhibits under

18  seal by the government for purposes of the hearing.)

19                  MR. CASEY:  Your Honor, the sentencing

20  memorandum is in considerable detail, and we are resting

21  largely on that in our position.  So I will try to keep my

22  comments fairly brief.

23          This is an intellectual property offense.  It is

24  not a typical theft offense where you can say, well, here

25  is the item, and it is worth this much, and that is what

                              47

1    the intended loss is.  It is not a typical fraud offense

2    where, for example, mortgage fraud and there is a house

3    that has a certain value.  What we are trying to do here

4    to account for this loss is value intellectual property.

5    You know, by nature it is a difficult thing but it is not

6    an impossible thing.  There are different ways to do it.

7          The guidelines explicitly provide one way to do

8    it.  You know, in the guideline comments it says, in a

9    theft and trade secret case we have to narrow it.  In this

10   particular type of case so where as Mr. Hobbs has larger

11   argued general rules.  Let's look at the particular rule.

12   The particular rule says if it's a trade secret case we

13   should look at the loss of value of that trade secret to

14   the company or you should look at the cost that the

15   company expended in producing that trade secret.

16          So I think that is where we begin with.  And

17   that is where you have the company's letter they referred

18   to it.  You know, it's also the company's victim impact

19   statement, it goes through different loss calculations.

20   And the company does begin with by saying, okay, let's

21   look at the loss of this information, and what it means is

22   the loss of our proprietor use of this information.  The

23   trade secrets, and harm in the theft of trade secrets is

24   that the company spent it's time researching, it's time

25   developing, it's time making it's on infrastructure, sale

                                48

|     |                                                                       |
|-----|-----------------------------------------------------------------------|
| 1   | structure, it's time basing this entire company's                     |
| 2   | structure over information it developed for it's own use.             |
| 3   | It protects that information that it basis it's business              |
| 4   | on.                                                                    |
| 5   | The harm here and the intended harm, the statute                      |
| 6   | requires that the intended harm, that there is intended               |
| 7   | harm, the intended harm is to use the information that you             |
| 8   | are not entitled to use.  Is to misappropriate that                   |
| 9   | information, that intellectual property for your own use.             |
| 10  | When looking at what that means the company.                          |
| 11  | When Pittsburgh Corning says in their letter, you know,               |
| 12  | they explain they are a very unique company.  And I think             |
| 13  | this is one of the sort of the more interesting parts of              |
| 14  | this case.  I analogies sometimes it's like the old torts             |
| 15  | case where you have the eggshell victim.  In this case,               |
| 16  | the crime was so targeted and I think that goes to some of            |
| 17  | the intent here.  The crime was so targeted that kind of              |
| 18  | took Pittsburgh Corning and attacked them at their most               |
| 19  | vulnerable spot.                                                      |
| 20  | Their ability to make a product better than                          |
| 21  | anyone else.  They made one profitable product called                 |
| 22  | FOAMGLAS insulation.  And they are the market leader, they            |
| 23  | are the market leader because they make it with properties            |
| 24  | that no one else can make that type of installation with.             |
| 25  | They make it lighter, it has better heat resistant                    |

49

properties.  It is what keeps them in business.  They are
        largely US-based manufacturing.  And what keeps them in
        business is their product is superior.  Mr. Huang was
        trying to purchase the trade secrets that allowed everyone
        in the field to make the product, everyone in the field
        can make it at a certain level.  He wanted the specific
        secrets the specific formula and manufacturing processes
        to make it as well as Pittsburgh Corning.  Pittsburgh
        Corning's letter says we are a company worth greater than
        $200 million dollars and we are largely worth it only
        because we make FOAMGLAS, we make glass insulation better
        than anyone else.

                The point here is that Mr. Huang was exploiting
        that intellectual property, that ability to make it better
        for his own use.  And Pittsburgh Corning's claim about it
        being a total evaluation of the company comes from the
        fact of if it gets out how to make it as well as we do,
        and if these other companies can make it more cheaply or
        can compete in foreign countries, then we won't be able to
        compete in the market place.  And that is their basis
        behind their statement.  Once the information is out, then
        ultimately since we no longer have the proprietary use,
        the sole use of our trade secrets, that information comes
        out, then we couldn't compete with us on other levels of
        cost and distribution and things like that.

                                      50

1           All of that said, you know, there is some reason

2   to think $200 million is a very large loss number.  And

3   for that reason the letter also goes into more tangible,

4   some more concrete numbers that the United States thinks

5   the Court should consider.

6           That same guideline rule says not only is it the

7   loss and value of the company of the trade secret.

8   Pittsburgh Corning says well, the trade secret becomes

9   useless to us if everyone else knows how to do it, and our

10  company becomes worthless.  But it is also the amount of

11  costs to create a trade secret, to protect it, the

12  investment in to that trade secret.  And the letter lays

13  out different research and development expenditures, some

14  different capital expenditures, and some different

15  security expenditures, that Pittsburgh Corning recently

16  made with regard to FOAMGLAS and the recent developments

17  of FOAMGLAS that allow them to have those high-quality

18  products.  And those are fairly concrete numbers.  Those

19  are the things that you can just add up to get a better

20  handle.  And if you add those up you can see the

21  $7 million dollar threshold for the guidelines.  And

22  that's why the United States is submitting giving sort of

23  the concreteness of that calculation, that that is a

24  minimal amount of loss that the Court should consider

25  here.  That loss of or sort of the sub-cost that

Denise C. Halasey, CCR No. 1257
Certified Court Reporter

Case 4:12-cr-00296-BCW   Document 62   Filed 04/02/13   Page 51 of 101

1    Pittsburgh Corning went into to develop their trade

2    secrets, their intellectual property, on how to make this

3    type of insulation better for everybody else.

4            That gives you a little more concrete number,

5    but I think more importantly that number would be is a

6    fairly reasonable foreseeable number.  And here's where I

7    think our primary disagreement with Mr. Hobbs position

8    comes in.  He says, well, Your Honor, you looking at a

9    case about intended loss, and you need to crawl inside my

10   client's head and look at his specific intended loss.  The

11   exactly -- the dollar figure he intended to be the loss

12   there.  And I don't think you read the cases, many of the

13   cases he cites are on an entirely different factual

14   scenario.  They are largely a series of mortgage fraud

15   cases and the question becomes whether or not you subtract

16   the collateral that's left over after the inflated

17   mortgage.  That is a very concrete, very concrete kind of

18   none intellectual, you know, real property fraud.  And it

19   just doesn't really analogize when we're talking about

20   intent.  It doesn't really analogize here this

21   intellectual property crime.  To better analogy is what

22   was the harm that was intended?  And what could be

23   reasonably foreseen as the consequences of that harm?  And

24   that's also -- the same cases he cites also say that as

25   the general principle.

52

And looking at it from that perspective because
the harm that is intended here is to deny Pittsburgh
Corning their exclusive franchise, their exclusive rights
to this information.  And the harm and the most reasonable
foreseeable from that harm well, statements like, that
just makes their research and development costs,
sub-costs, that they get no benefit from.  That just makes
their security procedures to protect sub-costs, that they
get no benefit.

                    And a sophisticated businessmen like Mr. Huang
who has a very successful business in China, a successful
businessman would know that.  He would foresee, he would
be able to foresee and understand if I steal their secrets
then they just lost the money they wasted on developing
the secrets.  In fact, the whole point in stealing the
secrets is that he doesn't have to spend the money to
research and development.

                    And so I think looking at that sort of
$7 million-dollar loss figure that the company spent for
the research and development costs gives the Court the
most concrete loss were you can also very easily see how
it would count as intended loss given the harm that Mr.
Huang has admitted to intending already today.

                    There's an alternative, Mr. Hobbs pointed out
that sometimes when you can't correct the value of loss
                              53

you look at the intended gain of that defendant. And a
lot of that is correct and if the Court finds that
appropriate to do here, Mr. Hobbs number in that regard to
$100 thousand we really couldn't disagree with more.

Mr. Huang, the evidence shows some of the
exhibits we have shows, the evidence would show that Mr.
Huang was in the process of putting a $20 million dollar
capital investment in producing a factory that would make
FOAMGLAS based on the Pittsburgh Corning's manufacturing
process and formula. You do not place a $20 million
dollar capital investment on something that you think is
worth a $100 thousand dollars. You think it's worth more
than $20 million dollars because that's the information
that's going to allow you to not only recruit your
investment, but to make you your profits.

Mr. Huang, I think the evidence shows that he
clearly valued this as extremely valuable information
because he stated with his own admission to start a 50,000
square meter factory with another 50,000 square meters to
be built soon thereafter. These are enormous capital
investments. It's not something he thought was a
$100,000.00 dollars. And the $100,000.00 dollars number
just wouldn't hold up because the guidelines will say
well, you can look at in a theft case you can look at fair
market value of the things that were stolen, but that

54

$100,000.00 dollars is not the fair market value of these

2 secrets.  This is contraband, this is contraband

3 intellectual property.  He's trying to steal something and

4 so he's trying to get what the black market would bare,

5 not what the fair market would bare.  The fair market

6 would bare much more, much greater over $20 million

7 dollars we submit just to learn these processes.  So the

8 $100,000.00 dollars just doesn't hold up.  You should look

9 at what Mr. Huang intended to benefit from.  And we submit

10 that that is greater than $20 million dollars.

11 I think it is important also to try to calculate

12 the loss of the guidelines.  There is a lot of tendency to

13 look at some of these numbers which are enormous.  To say

14 well, the crime wasn't that bad.  I think the intended

15 crime had it completed, in fact, would've been that bad.

16 And that is what we are looking at.  What is the loss that

17 he intended this harm and what would he had foreseen?  He

18 could have foreseen multi-million dollar losses to

19 Pittsburgh Corning.

20 And the last comment I want to make with regard

21 to the claim of competition.  One thing that is in the

22 Pittsburgh Corning's letter is that the glass insulation

23 it is a fungible product.  Once you can make it, once you

24 can make it a certain quality, you can make it for multi

25 purposes.  Mr. Huang statement that he was only going to

55

make it for building purposes in one area just doesn't
stand the common sense test of business. Businessman can
make a product, sell it at higher profits and sell it at
different places, he will. And his self-serving
statements at a dinner meeting where he is trying to
convince an employee of the company to steal secrets for
him, just as Mr. Hobbs has suggested the credibility for
the companies own representation. I think the Court needs
to take those factors into consideration too. Where as,
yes, he didn't know he was being recorded, but he was
trying to get someone to steal for him. And that is also
context in which you are not particular going to be honest
and say what the person wants to hear. Well, the employee
of Pittsburgh Corning, the stealing at Pittsburgh Corning
who said I'm worried he's going to put us out of business.
What he would like to hear is to say, no, we are not going
to put you out of business. And that's where the context
of that conversation comes in. And that's why they don't
want to tell us anymore about Mr. Huang's intent. Their
not special mirror into Mr. Huang's intent as Mr. Hobbs
has suggested that they are. Instead, his crime is a
mirror of what his intent was. His intent was to deny
Pittsburgh Corning their rightful use to their own
intellectual property.

                    THE COURT: Thank you. Mr. Hobbs.
                            56

Case 4:12-cr-00296-BCW   Document 62   Filed 04/02/13   Page 56 of 101

1          MR. HOBBS:  It is clear from the

2     exhibits that Pittsburgh undercover employee was trying

3     his best to get admissions to the best of his ability.

4     And in reply to that, we believe the recitations of that

5     show that he was not being self-serving it shows what is

6     truly going through the state of mind.  And Wells and

7     other cases say to look at the intended loss, if there is

8     no actual loss.

9          I'd say, finally, Judge, that perhaps the best

10    illustration of why the loss is not as high as the

11    government suggests is in the various arguments the Court

12    has heard.  The guidelines say the fact that 2B1.1.B the

13    Court should use the gain and the result from the defense

14    as an alternative measure of loss only for the loss that

15    can not reasonably be determined.

16          We think on the state of this record and

17    recognize that the government has the burden of proof even

18    by preponderance standard they still have the burden of

19    proof.  There is not gain.  There was an intended loss,

20    but certainly not the amount the government suggests.

21          And finally, it is true they give examples in

22    determining the loss in a trade secret case you look at

23    the cost of developing information.  That's true, it is

24    actual loss.  Just know that doesn't undermine the

25    intended loss concept.  The United States versus Wells and

                              57

```
 1    other authorities don't limit intended loss to bank fraud

 2    cases, that is a doctrine that applies to nearly every

 3    white-collar case.  And best example of his intended loss

 4    we think are his words when he is not aware of the

 5    listener.  He doesn't know anything other than he is

 6    trying to commit this offense.  That is the best

 7    illustration when he was truly intended.

 8                    THE COURT:  Well, then the government

 9    proffered other statements where that would run counter to

10    that.  You recognize that?

11                    MR. HOBBS:  Right.

12                    THE COURT:  So do they nullify each

13    other?  And so, I mean, then that leaves you with the rest

14    that is out there.

15                    MR. HOBBS:  We say that they don't carry

16    the burden of proof.

17                    THE COURT:  Okay.

18                    MR. HOBBS:  That's all I have.

19                    MR. CASEY:  Nothing further from the

20    United States.

21                    THE COURT:  Okay.  Let me take probably

22    a ten minute recess.  I want to look at few things and

23    then I will come back out and make a determination.

24                    (THEREUPON, a short recess was had;

25    WHEREUPON, the following proceedings were had.)
```
58

1          THE COURT:  Okay.  The Court has come to

2     a determination on what the Court believes based upon the

3     preponderance of the evidence what the Court believes to

4     be the intended loss in this case.

5          The Court finds that the loss in this particular

6     case would be between $7 million and $20 million which

7     would be a 20 level increase.  The Court will attempt to

8     explain.

9          I think the Court looks to the sentencing

10    guidelines.  The Court looks to the section that was

11    referenced by Counsel under 2B1.1, the comments of the

12    3(C)(ii) that in the case of proprietary information the

13    cost of developing that information or the reduction and

14    value of that information that resulted from the offense.

15    And the Court did consider what was presented to the Court

16    and made a determination based upon the cost of the

17    research and the development in the use of this particular

18    product fell within that range.

19          Further, the Court will note and I think that

20    even reasonably foreseeable, and I did find credible with

21    regard to Mr. Huang's comment or his intent that it wasn't

22    the desire to affect Pittsburgh Corning in anyway.  That

23    this information would be used in another, for lack of

24    better a word, area, and not the same area to which

25    Corning were using it.  I think the proprietary nature of
                                    59

```
 1    the research and develop goes into this product.  And it's
 2    clear at least for the Court, from all that was presented
 3    and proffered to the Court, that Corning was attempted,
 4    maybe not successfully to, start a business in China.  I
 5    think further whether the area or whether this door
 6    business, once you have that sort of trademark or
 7    intellectual property, if you don't safeguard it, that
 8    very product could come back and harm, you know, the
 9    company or some company that holds values operating in the
10    United States.  So that argument falls short in his
11    intent.  The Court doesn't find credible in that.
12            And I think another good point is that you are
13    investing or prepared to invest capital investment of $20
14    million dollars into a factory.  I don't think it is
15    credible to suggest that you wouldn't attempt to recoup
16    your investment and/or make some future profits.  So I
17    don't think subjectively -- I think it is foreseeable that
18    Mr. Huang knew that this could have a devastating effect
19    to this company.  And I think he in fact said it in
20    portions of -- at least what the Court has received on the
21    record and what was proffered to the Court as it relates
22    to whether Corning would stay in business or not stay in
23    business, this particular individual who is working with
24    the government could have a job with them.  I think it's
25    clear and I don't think his comments made, I think they
```

                                  60

```
 1   were self-serving.  I think to induce that person to

 2   provide with information necessary.  It wouldn't shock the

 3   Court that he would make these.  This is a value or at

 4   least in his mind the Court believes someone who has

 5   valued with regard to Corning company, worked and was

 6   concerned about what he was doing.  And Mr. Huang in this

 7   Court's opinion would say what is needed to make that

 8   person comfortable to part with what Mr. Huang was

 9   seeking.

10          With that said, the Court finds in the case of

11   Mr. Huang that the total offense level would be a 23,

12   criminal history category is a one, which would make the

13   sentencing guidelines between 46 and 57 months.

14          With regard to Mr. Qi and his offense level the

15   Court finds is 19, criminal history category a one, and

16   the guideline range would be 30 to 37 months.

17          With that said, it is the Court's intent to take

18   up or impose sentence for your client, Mr. Gaddy, Mr. Qi.

19          Well, pursuant to the plea agreement and the

20   Court accepted the plea agreement, the binding plea

21   agreement of the parties.  Is there any good reason why

22   the Court should not impose sentence at this time?

23              MR. GADDY:  Nothing, Judge.

24              THE COURT:  Okay.  Mr. Qi, it is the

25   judgment of the Court that you are, sir, sentenced to time
                                61
```

served. There will be no term of supervised release. A
$25,000.00 dollar fine shall be imposed. Further, sir,
you are ordered that you shall pay to the United States a
special assessment of a $100.00 dollars which shall be due
immediately.

Let me ask, Counsel, with respect to the
$20,000.00 dollar fine, could you address that in the plea
agreement, was that, Mr. Gaddy?

MR. GADDY: Yes, Judge, I'm prepared to
address that.

THE COURT: Okay.

MR. GADDY: First of all the $100.00
dollar special assessment has been paid this morning.
I've already seen it.

THE COURT: Okay.

MR. GADDY: With regard to the
$20,000.00 dollar fine there is a bond, a cash bond that
was posted in this case on behalf of Mr. Qi. That bond is
in the amount of $20,000.00 dollars. The clerk's office
indicated to me that you could simply order that the cash
bond be used to satisfy the fine that has been imposed by
the Court. We would note that the cash bond was posted
actually by Counsel, Yi Sun on behalf of Mr. Qi. The
clerk suggested that we confirm with the parties and with
Ms. Sun that there is no objection to the bond amount

62

```
 1     being used for the fines that she's referenced on the

 2     receipt and she is prepared to do that today.  I acquired,

 3     Judge, whether there is any further paperwork they needed,

 4     and they said basically your order that is what they need.

 5                    THE COURT:  Okay.  Now, is she here

 6     today?

 7                    MR. GADDY:  Yes.

 8                    MS. SUN:  Yes.

 9                    THE COURT:  Oh, okay.  Okay.

10                    MR. GADDY:  She was assisting both

11     defendants prior to Mr. Hobbs and my representation.  It

12     is not her property, it was posted on their behalf by her.

13     And she is listed on the receipt.

14                    THE COURT:  Okay.  Well, the Court will

15     find that, and the Court will include in this order that

16     the cash bond be used to satisfy the fine that is imposed

17     in this case if there is no objection?

18                    MS. SUN:  No, Your Honor.

19                    THE COURT:  Okay.  Further, the Court

20     will find that the order of preliminary forfeiture is now

21     final at this time.

22                    MR. GADDY:  No objections.

23                    THE COURT:  Okay.  I think ultimately

24     and the Court will make a record with regard to Mr. Qi.

25             The Court accepted the binding plea agreement of
```

Denise C. Halasey, CCR No. 1257
Certified Court Reporter

the parties.  I think in doing so the Court after

conferring with Counsel believes that this plea agreement

and the role in which you played, and the time served that

the Court has imposed is in compliance with 18 U.S.C.

§3553.  And I think it meets looking at you and your

background.  Looking at the crime that you had plead

guilty to.  Looking at your role in the crime.  I think

this sentence and the fine imposed and you role reflect

the seriousness of the offense.  And I think it will

forward an adequate deterrence with respect to criminal

contact.  And I think, I believe it will protect the

public in this Court's opinion from further crimes of you,

sir.

        Now, with that said, Mr. Qi, now that the Court

has imposed the sentence, you have and the Court advises

you of your right to an appeal what I've done here today,

sir.  And you can appeal this sentence pursuant to 18

U.S.C. Section 3742 and subject to any waiver in the plea

agreement in this case.  You have -- you can loss your

right to appeal, sir, if you do not timely file notice of

appeal in the District Court pursuant to federal rule and

criminal procedure.  You have 14 days from entry of

judgment to file notice of appeal on your behalf.  The

Court will let you know the Court will enter judgment as

of today's date.  If you are unable to pay the cost of

                              64

```
1    appeal, you have the right to apply for leave to appeal in

2    forma pauperis.

3              With that said, is there anything else further

4    for the record as it relates to Mr. Qi?

5              MR. CASEY:  That's it for the United

6    States, Your Honor.

7              MR. GADDY:  Nothing further, Judge,

8    thank you.

9              THE COURT:  Okay.  Mr. Hobbs, relative

10   to Mr. Huang, I know you have at least argument to the

11   Court in terms of recommendation.

12             MR. HOBBS:  First, Judge, before the

13   Court is the defendant's sentencing memorandum.  In aid of

14   that you have already seen some of the exhibits.  Also

15   Your Honor, this week we hand delivered to the probation

16   officer background information upon Mr. Huang, about

17   Mr. Huang and I wanted to make reference to that as I make

18   my remarks.

19             I'd first like to make an initial observation,

20   Judge.  On behalf of Mr. Huang we very much appreciate the

21   discretion and the professionalism that the United States

22   Attorney's office and the case agents have extended.  We

23   understand that they did not have to allow for the range,

24   and they did, and we appreciate that.

25             Having said that, there is strong disagreement,
```

65

1    however, within the range with all due respect.  And I'd
2    like to address some of the most important reasons why.
3            First, Judge, if you look at page 23 of the
4    sentencing memorandum.  We talk in terms of the
5    immigration consequences and I think that it's appropriate
6    factor for the Court to consider.  And I'll note that the
7    Court notes for the record that Mr. Versseld is here, an
8    attorney with expertise in areas of immigration is
9    available if my remarks lead themselves to any questions.
10           At page 23 of the sentencing memorandum we point
11   out that if this Court gives a custody sentence an excess
12   of 12 months, it will put Mr. Huang in a position where he
13   will not be eligible for a bond and will not appear before
14   immigration, Judge, for some time.  He'll be placed in an
15   administrative removal proceedings.  He will be detained
16   while going through the administrative removal
17   proceedings.  And then they will have to make travel
18   arrangements for him to be deported.  And it will be
19   deemed an aggravated felony meaning that he will not be
20   entitled to a bond as he is going through that process.
21   So if the Court were to give him custody sentence in an
22   excess of 12 months, that is a direct consequence of what
23   would happen.  And that is different than any American
24   citizen because it is likely to lead to substantial
25   incarceration.

                                66

Now, that is different than the second notion

that we cannot escape from which is this is a crime of

moral turpitude as it points out on page 24.  Unlike an

aggravated felony designation, a crime of moral turpitude

would put Mr. Huang in a position of being eligible for

bond.  And he would wait to appear before an immigration

judge, and may be eligible departure, much like what was

just allowed for Mr. Qi.

And so we are asking for the Court to fashion a

sentence that would allow this offense to be deemed the

kind of moral turpitude, but to avoid the designation of

an aggravated felony.  Which means by definition we are

asking for a sentence of less than 12 months.

Specifically we are asking for a supervised

release sentence.  And should be noted, Judge, That

Mr. Huang along with Mr. Qi did approximately nine days in

custody at CCA before they were released upon bond.  And

we are asking that he too get credit for time served, and

placed on a term of supervised release for 11 months.  The

reason we are asking for that would be under the twelve

month benchmark.  Immigration does not distinguish between

probation, supervised release or custody if it is a

sentence in excess of twelve months, the aggravated felony

designation emerges and that is a great detriment and we

believe a detriment that is greater than necessary to

```
1    achieve the sentencing goals and contrary to U.S.C. §
2    3553(a).
3              In addition, Judge, and perhaps equally
4    compelling, if not more so.  Is when I have been referring
5    to as conditions of confinement.  If you look at page 29
6    of the sentencing memorandum we try to describe this in
7    some detail.  And I have been privileged in my practice to
8    have worked for approximately 25 years of legal assistance
9    sitting beside me and she has great skill in a lot of
10   areas.  One of them is contact with the federal prison
11   system.  And again, she is here if the Court has any
12   further questions and we have proffered based upon her
13   contact the following.
14             She contacted the Designation and Sentence
15   Computation Center referred to as the DSCC.  After being
16   explained that Mr. Huang's offense conduct did not involve
17   matters of national security, we have been informed that
18   Mr. Huang be housed in a low security specialist
19   population privately managed facilities.  There are no
20   Mandarin Chinese translators within any federal
21   institutions.  DSCC explained that most Chinese inmates
22   are located in the northeast region of the country,
23   interesting enough, in either Ohio or Pennsylvania.  He
24   can request translation services over the phone.  That is
25   rare and unlikely to make an international call.  Further,
```

68

1  any letter that he might want to write to his wife or

2  daughter in Chinese would have to be translated in English

3  before it could be mailed and vice versa. And it is

4  possible that despite the best efforts that Mr. Huang is

5  going to be in a very, very precarious situation.

6         Now, I understand that his conduct while in the

7  United States put him in this position. I understand

8  that, Judge. But the effect of that is you basically have

9  someone who is dealing with conditions that are far more

10  severe than any American citizen. And interestingly as we

11  pointed out in Page 29 and 30 even before the guidelines

12  became advisory, conditions of confinement have been

13  deemed a basis to depart on the old term and now dealing

14  with a variance. The case that we cite includes the

15  Francis case which is interesting there because the

16  defendant was housed in a nonfederal facility that was a

17  private facility. And this is where they note, they say

18  the defendant at his hearing had evidence of numbers of

19  specific problems. Some complaints were minor, inadequate

20  commissary, inadequate television while being an inmate,

21  overcrowding, lack of Spanish reading-materials, a problem

22  with visitation. They also pointed out that he couldn't

23  even get basic needs, unsanitary food. They pointed out

24  the risk of physical and psychological problems,

25  specifically physical attacks. And we fear the very same

69

1    thing can happen to Mr. Huang.  An inmate shouldn't be

2    running the facility and the fact is that is what

3    happened.  In fact, in most cases the inmates are specific

4    in different facilities so you don't have the need to go

5    to an inmate for a request.  And yet, despite what you

6    would think, you would think that there would be

7    correctional facilities here that have correctional

8    officers speaking Mandarin.  That's not the situation.

9    And this Court go through the example or the type of thing

10   that we fear Mr. Huang would have to endure.  Just the

11   simple thing like asking for sanitary or asking for

12   commissary items or asking to follow a directive and

13   having to be translated through another inmate.  Standard

14   of due process almost cruel and usual type punishment

15   issue that doesn't have to happen.  It certainly isn't

16   going to happen for Mr. Qi.

17          We believe that Mr. Huang's conduct would allow

18   the Court to put him also on supervised release for an 11

19   month period and monitor.  If he violated then you could

20   argue there is no sympathy.  You've given him the

21   opportunity.  An 11 month supervised release period.

22              THE COURT:  Where would Mr. Huang --

23   where would he be?  The Court is not understanding so.

24              MR. HOBBS:  Sure.  He is right now,

25   Judge, he is Lawrence, Kansas.

70

```
 1                    THE COURT:  Okay.

 2                    MR. HOBBS:  And he has been there on

 3     home arrest for approximately four months.  Then the Court

 4     released him from home arrest, and he's no issues in terms

 5     of violations.  He can remain in Lawrence or he could be

 6     transported -- if we had cooperation with the Eastern

 7     District to St. Louis.  Ms. Sun is located in St. Louis

 8     and operates there.  There are -- it's an opportunity or I

 9     guess you can say during the pendency of this case he has

10     had some visits from certain family friends to Lawrence.

11     And it has worked well.  He's come to our office in

12     Lawrence and he was on house arrest without any incident.

13     So we believe that degree of supervision would be

14     sufficient additional penalty under these circumstances.

15                    The other thing is, Judge, I'd point out or what

16     you might consider somewhat more traditional sentencing

17     arguments, but I think that are meaningful.  He has a wife

18     and a daughter.  The banishment from the United States's,

19     because whatever happens he will be deported, is a true

20     punishment for him.  Fifty percent of his business for

21     this promotional product company has been in the United

22     States for which he will never to be able to return.  So

23     that is a true deterrent that may occur for Mr. Huang.

24                    Additionally, Judge we cite in our sentencing

25     memorandum of page 11 the employment departure.  Sometimes
```

                                   71

1    you don't have that.  In the Milikowsky case,

2    M-I-L-I-K-O-W-S-K-Y, and Olbres, O-L-B-R-E-S.  Talk about

3    if the sentencing of the defendant might have an adverse

4    impact on others who are not involved in the wrong doing

5    as an employment impact.  That is a basis for a departure.

6    And as we have proffered the materials in this Ningbo

7    company that has been operated by Mr. Huang has over ten

8    hundred employees so they do not have the President or the

9    sole of the company available at this time.  And

10   hopefully, they won't have to deal with that for eighteen

11   months in custody.

12          Additionally, Judge, I again, have the letters

13   here and I made some reference in chambers.  Mr. Huang's

14   father is near death.  He was in ICU recently, and he's

15   been released to his home.  His father also suffers from

16   Alzheimer's.  We have photographs and letters that I know

17   the Court is aware of.

18          One of them that I found very interesting is

19   this letter from an employee who talks about an event that

20   happened with Mr. Huang.  She said when something happens

21   to our family, he sent us money, clothes and his love as

22   soon as possible.  When the earthquake occurred in Sichuan

23   S-I-C-H-U-A-N, Mr. Huang was the first to give his money

24   to employees of Sichuan and motivated other employees to

25   donate clothing, money and materials to the disaster area.

                              72

1          These factors of the 3553(a) factors that go to

2     the defender are certain characteristics that the Court is

3     allowed to consider in terms of fashioning the downward

4     departure.  These are heartfelt, they are meaningful and

5     they are things that I think speak to the background of

6     Mr. Huang.

7                    THE COURT:  Counsel, can I ask you a

8     question?

9                    MR. HOBBS:  Sure, Judge.

10                    THE COURT:  And I think it goes back,

11    rather does go back to, I believe, your second argument as

12    it relates to speaking Mandarin and being placed.  And you

13    know, the basic needs, you can't get addressed.  And I'm

14    trying to look and just have a better understanding just

15    of that.  And I'm going to generalize a bit and obviously

16    I'm going to look at the particulars of your client in

17    making or fashioning and imposing a sentence.

18                    Just from the standpoint of incarceration, can

19    there be -- what is the arguments for others who maybe

20    similarly situated in terms of language, the language

21    barrier?  And because of their language barrier, they're

22    put into institutions around this country of Mandarin and

23    maybe there's another language -- are not there and say

24    their conduct which got them there is some may say more

25    egregious than that, I'm saying some more egregious than

                                    73

```
1    your client.  So the basis in which the Court considers

2    putting -- and I know that is a consideration, I

3    understand that.  But the Court finds it difficult, the

4    Court would be limited in a lot of situations and

5    incarcerate someone for that very reason.  You understand

6    what I'm saying?  I guess my point is, I understand your

7    point, is that a basis in which -- and now, may be

8    certainly in this situation, I think Mr. Huang maybe

9    similarly situated.  Say we didn't have a person, would I

10   get that this argument with regards to that language

11   barrier for someone else?  If they couldn't reasonably

12   meet the basic needs because of the language barrier?  Are

13   you following?

14              MR. HOBBS:  I believe so, Judge.  And I

15   think the answer is you might.  But interestingly in

16   exploring that topic in the Stealth and Francis case, the

17   opinion goes on to say contrary to the government's

18   argument, the motion for downward departure based on

19   conditions of confinement is simply judicially imposed

20   prison reform and is therefore inappropriate.  This Court

21   is under no illusion of this departure for single

22   defendant or any prison reform or is it the desired role

23   of the Court to do so.

24              Rather the departure is warranted because the

25   defendant experienced extraordinary stress, fear for his
```

74

1    safety due to his being placed 13 and a half months in an

2    institution in which the conditions of confinement were

3    below the conditions of confinement in federal

4    institutions for others.

5                        THE COURT:  Okay.

6                        MR. HOBBS:  So I guess the point I'm

7    saying is, Judge, perhaps there is a responsibility for

8    prosecution of these cases that there be better

9    facilities.  All we can deal with is the reality of it.

10   And all we have been told if you were to fashion a custody

11   sentence the DSCC says that the judgment should say that

12   it is recommended that the Bureau of Prisons that the

13   defendant be placed in a facility with a Mandarin Chinese

14   speaking staff member.  And if there are none available

15   then a facility with a Mandarin Chinese speaking

16   population.

17        And I know that that is just the recommendation,

18   but at least would maximized what we are told that people

19   with a background like Mr. Huang are likely to go to the

20   northeast and with many cases they are dealing with

21   inmates and not correctional officers.

22                        THE COURT:  Okay.  Thank you.  I

23   appreciate that.

24                        MR. HOBBS:  I think I would finally say,

25   Judge, that the overriding goal of 18 U.S.C. §3553(a) is

                              75

very direct and it is simple in it's words.  And it says

2 after you go through the guidelines, sensory advisory, you

3 in your discretion to fashion a sentence that is

4 sufficient, but not greater than necessary to realize the

5 sentencing goals.

6         And we recognize this is a serious offense, but

7 it also lists other factors that are just as important.

8 The background of the defendant, any interruption of

9 medical treatment, we would say the interruption of

10 disability to go home and the analysis to that.  Taking

11 into the account the characteristic of the defender, there

12 is a list of things.  Some Courts call it the preamble,

13 sufficient but not greater than necessary.  And we would

14 ask in the most heartfelt way that a sentence of

15 supervised release on a felony where he will be deported.

16 Hopefully voluntarily, never be able to come back even

17 though fifty percent of his business is in the United

18 States is a sufficient message.

19         Unfortunately, whatever you do, probably may or

20 may not have general deterrence that is unfortunately the

21 world we are in.  But is a specific deterrence for Mr.

22 Huang he's has dealt with this case I think appropriately

23 and seriously.  You can understand what if there had been

24 a trial of jury selection, opening statement?  He

25 forfeited his rights to a trial, he has accepted

                                76

1   responsibility, he has serious repercussions, and we are

2   hopeful that the Court will not impose a sentence greater

3   than one year.

4                    THE COURT:  Okay.  Thank you, Counsel.

5   Mr. Casey?

6                    MR. CASEY:  Judge, this is a serious

7   offense, it is a serious offense that has a pretty

8   significant guideline range for a crime like this.  This

9   is a white-collar crime.  It was an intent, no actual

10  loss, but never the less the guideline range is 46 to 57

11  months.  I think that reflects pretty accurately the

12  seriousness of the offense and the potential harm raised.

13           And when thinking about sentencing it I know

14  that you're left with a plea that is a range that is well

15  below that guidelines range.  And, you know, kind of

16  explain how the parties got to that first, but I think the

17  first factor to think about in sentencing this case is

18  deterrence.

19           I mean, this is I don't want to say rare, but is

20  somewhat unusual case in which deterrent is an extremely

21  factor that the Court should consider when they are

22  considering this sentence.  Sometimes I hear defense

23  counsel, well, Judge this is a drug case, you know,

24  dopper's don't pay attention to the news, how do you

25  consider deterrence or Judge this was a crime of passion

                                77

1    and no one is, you know, thinking of deterrence in that

2    instance.

3            Well, this is a case involving a crime that has

4    become part of our national conversation.  Back in the

5    fall there were presidential debates where the questions

6    based to the candidates was what are we going to do about

7    theft of trade secrets from companies in China?  This is a

8    significant national problem that US companies are having

9    to deal with.  And here's an opportunity to serve

10   significant general deterrence by saying we will punish

11   these crimes.  If you come into the United States, if you

12   want to steal our intellectual property, you want to hurt

13   our company's, you want to lead to possibly the

14   unemployment of our workers, we will punish those crimes.

15   And that will have to sophisticated parties, to

16   businessmen, that will have a deterrence effect.  It will

17   be noticed and it will, you know, be achieve the factors

18   of 3553(a).

19           In particular, also on deterrence with this

20   particular defendant, our sentencing submission has some

21   reports that, you know, at least gives suggestion that he

22   had done some similar noncompetitive practices with other

23   companies in the US that he had been involved with.  He

24   searches out the US companies just like he originally did

25   with Pittsburgh Corning.  He tries to get a deal with

                                78

them.  But then takes what he learns from them, does his own thing in China, and comes back and sell the project in the United States.  So for this particular defendant there is a deterrence reason to come to a impose a significant sentence.

I think on all of the of 3553(a) factors that is the one to keep most in your mind when factoring this sentence here.  And the United States asks that sentence to be 18 months.

An 18 month sentence in this case given the totality of the 3553 factors is sufficient and no greater than necessary.  In fact, it is the minimum sufficient sentence given to properly punish this case.  Anything less than that term of imprisonment simply wouldn't be sufficient.  And that's even taking into account what is fairly significant and fairly unusual that the defendant is paying a full maximum allowable fine in this case. Even taking that into account.  That is punitive, that is part of the punishment, and it is part of what is factored in to the United States asking for a binding sentencing agreement although what the anticipated guidelines would be.  But it itself is not enough when looking at the 3553(a) factors, you're looking at informing a just sentence.  And a just sentence in this case will involve some term of confinement.  While that fine is punitive, it

79

is not itself sufficient to properly punish this case.

2            And I think that that also is a topic that

3    touches on some of the things Mr. Hobbs said about the

4    conditions of confinement.  You know, in recommending 18

5    months, again, significant variants.  The United States

6    understands that time in prison for Mr. Huang will be hard

7    time.  It will be difficult.  There are language issues.

8    There is the fact that he is white-collar defendant who is

9    a businessman in a different country.  But difficult does

10   not mean inappropriate.  In this case it would be

11   appropriate for him to serve a term of confinement in the

12   United States.  Certainly difficult does not even come

13   close to cruel an unusual or some type of constitutional

14   deficiency.  Time is difficult for everyone and the

15   appropriate amount of time would be 18 months for

16   Mr. Huang.

17           Part of the reasons that a term of confinement

18   and a substantial one should be left to the Court should

19   consider is this is a fairly unique case.  It is a unique

20   set of facts, it's unusual.  There is a sting in a type of

21   case like this.  But it is particularly unique about who

22   the defendant is.  In this case the defendant is the party

23   that stood to benefit from the crime.  In a typical theft

24   and trade secrets case what you have is a foreign company

25   infiltrating or ingratiating itself to an employee of a US

                                  80

company.  It pays the employee a certain amount of money
to steal proprietary information for it.  And who we are
able to catch, who the government ultimately catches is
that employee.  Whether it's when they are leaving the
country with stolen documents or there is an e-mail string
that we find.  And that is a typical case.  But the
foreign company that was paying for the secrets,
committing the fraud, isn't brought before the Court.
Isn't brought -- criminal charges aren't brought against
them.  In this case it is unique in that it's the owner of
the company.  It's the benefactor.  It's the person who is
going to financially benefit.  It's the person who is
willing to invest $20 million dollars just to ramp up in
anticipation of the trade -- this information.  I think
that shows that this was incredibly valuable and could've
been incredibly lucrative to Mr. Huang.  He is exactly the
person that this crime is aid at to stop.  And in this
case we have arrested him.  We have convicted him.  He is
a person that is before you.  And he the person that I
would think you need to take the factor, he is the company
owner, he is the benefactor.  And that is something that
should be more in fashioned to sentence.  It is part of
the reason why the government thought it was appropriate
that Mr. Qi not serve time, he wasn't going to be the
benefactor, he was just an employee.  Mr. Huang, however,

Denise C. Halasey, CCR No. 1257
Certified Court Reporter

18 months is really sort of a minimum necessary sentence
to satisfy those factors.

I also just want to touch on, you know, Mr.
Hobbs has stated many times about the history and
characteristics of the defendant that you should take into
consideration with the immigration factors.  It is
interesting whether or not there is any immigration
consequence for this defendant is itself very speculative.
We don't know what ICE will do with this defendant.  And
it is collateral, it is collateral consequence for what
this Court has in front of it, and that is to fashion and
impose a just sentence.

Whether or not the sentence categorizes him as
an aggravated felony I think shouldn't be in this Court
consideration.  The Court should find a just punishment.
If that just punishment finds that this person committed
an aggravated felony, then in fact it was an aggravated
felony.  And he should according to our laws be held
accountable for that.

And still I don't really think the immigration
consequences factor -- I think this Court should factor
rather the other 43553(a) factors which we believe would
be --

THE COURT:  Would it be improper if I
did consider it?

82

```
1                    MR. CASEY:  Pardon?

2                    THE COURT:  Would it be improper if I

3       did consider it?

4                    MR. CASEY:  Well, Your Honor, I did look

5       into that issue actually.

6                    THE COURT:  Right.

7                    MR. CASEY:  And I didn't find a clear

8       issue.  I didn't see anything to say that it would be.

9       And so I don't think it would be, however, when

10      considering the history and characteristics I think that

11      there are other factors that imply a term of imprisonment

12      greater than a year.

13                   THE COURT:  And I certainly understand

14      the government's position.  I just since you said that I

15      had a question with regard to that.  Thank you.

16                   MR. CASEY:  And I didn't get a

17      conclusive and I didn't see anything to suggest it would.

18                   THE COURT:  Thank you.  Mr. Hobbs?

19                   MR. HOBBS:  On Page 32 of the sentencing

20      memorandum we are asking that the judgment commitment

21      order for Mr. Huang indicate that he be committed to the

22      custody of the Bureau of Prisons to be imprisoned for a

23      total of time served.  And be placed immediately upon a

24      term of 11 months supervised release with whatever

25      conditions the Court deems appropriate.
```

83

Case 4:12-cr-00296-BCW  Document 62  Filed 04/02/13  Page 83 of 101

I believe this case cries out for that.  And I

will give an example, Judge.  If this was a white-collar

defendant, America citizen, and you gave him an 18 month

sentence.  In Kansas City there is a high probability he

would get into a federal prison camp in Leavenworth.

While he was there within 45 minutes if he needed to talk

to an attorney, he could do that or a family member.  He

would be eligible for release after serving 85 percent to

a halfway house and then mainstream back home.  None of

that is going to apply.  In fact, even a simple

conversation we have only been able to successfully do is

because Yi Sun coming over from St. Louis.  Any custody

sentence is absolutely more than is necessary to reach the

sentencing goals.

I will also point out for the record that the

$250,000.00 dollar fine has been paid in full.  We also

have tendered for the record the $100.00 dollar special

assessment.  We have the $150,000.00 dollar check from Ms.

Sun's law firm that will be coupled with the $100,000.00

dollar bond.  And I'll have the record reflect that

similarly like Mr. Qi there is no objection having that

bond money being utilized for the fine.

And this isn't an effort to buy one's way out of

a penalty.  This is a severe penalty.  Unlike this hallow

words of a penalty being imposed and may or may not ever

1     actually be paid, this is money that has been paid.

2              I would also ask that at the end of the

3     proceedings today that Count II be dismissed.

4              And finally, Judge, on the immigration

5     consequences.  I think it is significant because again, if

6     he was an American citizen he wouldn't be facing more

7     indetermined amount of time upon service of his sentence.

8     So that is a factor.

9              And the conditions of confinement we talked

10    about earlier.  It's going to be -- the conditions of

11    doing prison should never be part of the penalty.  The

12    penalty is the amount of time, not how you do it.  That is

13    what distinguishes us from a lot of countries.  But the

14    effect of human resources it will be very, very difficult

15    and that is unnecessary to realize deterrence.

16                    THE COURT:  But arguably that doesn't

17    necessarily necessitate the need not to impose a sentence.

18    That fact alone.  Unless there is some constitutional

19    violations to -- I guess that is my point to my question.

20    The fact that that is the situation and may be the

21    situation, does it necessarily necessitate the Court not

22    imposing a sentence?  Because if the Court was to follow

23    that, the Court believed that, then people -- anyone who

24    may have had their incarceration which may be more

25    difficult than otherwise someone else had.  That would be

                              85

1    reason despite the crime in which they are charged.

2    Despite that, my point is that would be reason not to

3    impose or to incarcerate someone?

4                    MR. HOBBS:  It is a reason to depart

5    downward.

6                    THE COURT:  Right.  Okay.

7                    MR. HOBBS:  And nor does that say that a

8    sufficient departure would be to complete supervised

9    release.

10                   THE COURT:  And I understand.  And I

11   recognize your client's situation would be a lot different

12   then maybe what I'm suggesting.  So I certainly understand

13   that.

14                   MR. HOBBS:  And again, I want to say one

15   final thing.  3553(a) also has a paragraph called (a)(6)

16   which is proportionate to one another.  And again, we

17   respect and appreciate the description, professionalism

18   that the US Attorney's office has bestowed upon both

19   defendants.  But how is it that an employee who allegedly

20   would've been the beneficiary is allowed time served and

21   allowed to go home this afternoon.  That is sufficient

22   deterrence.  But despite all of the factors in the

23   sentencing memorandum somehow Mr. Huang has to do 18

24   months plus face unknown additional time from ICE custody.

25   How is that proportional with one another?

                              86

I finally point out, Judge, that the materials

have a brief statement and allocution that Mr. Huang had

translated into English, but he is also prepared before

you pass final sentence with the assistance of an

interpreter to make a brief state to the Court.

                THE COURT:  And I'm going to allow you

Mr. Casey a moment to respond.  And then I'm going to

allow Mr. Huang to make his allocution to the Court.  Mr.

Casey.

                MR. CASEY:  Thank you, Judge.  Just

very, very brief.  With regard to Mr. Qi and regard to the

proportionality, you know, treating two similar situated

defendants similarly.  I think the simply answer is they

are not similar situated defendants.

                Mr. Qi was an employee.  And I think the facts

show he was an employee of Mr. Huang who wasn't involved

in the initial trips to the United States to find out this

information.  He wasn't involved in the planning of either

the factory, the company or the trip.  Instead, he was

just told, hey, you are coming with me to translate.  Now,

he was charged.  Probably so, because while he was here he

fully participated in the effort to obtain the stolen

information.  But nonetheless, he wasn't the mastermind,

and there is no indication whether or not that he would've

benefited.  Certainly not to the degree that Mr. Huang was

                                87

```
1    going to benefit from it.
2            But also importantly, and I think something that
3    factored significantly in to the sentences that -- while
4    the defendants were for logistical reasons plead and
5    sentenced together, Mr. Qi long previously had indicated
6    to the United States that he wanted to plead guilty and
7    was willing to testify at trial in this case.  Because we
8    agreed to a binding plea agreement that was of time
9    served, and no additional jail time a substantial
10   assistance motion, you know, wasn't warranted.  But that
11   fact, the fact that he was available to cooperate greatly
12   significantly, you know, significantly affected the
13   sentencing decision of the United States.  And was
14   something that had previously been on the record and I
15   think addresses that proportionality.
16               THE COURT:  Thank you.  Mr. Hobbs, if
17   Mr. Huang at this time he can approach the podium.  Mr.
18   Huang.
19               MR. HUANG:  Honorable Judge, I
20   appreciate very much the work you did on my case.  I
21   apologize deeply and feel guilty about the burdens that
22   were to the federal government as well as to the loss to
23   Pittsburgh Corning.  I am also sorry that my behavior also
24   impacted my family.  And during those four months that I
25   was away from my family, for the full five months of the
```
                                88

time that I was away from my family, my family is eagerly

2 awaiting for my return.  They miss me very much and they

3 cry and pray for me and are worried about me.  And now I

4 got the news that my dad is dying.  I feel in despair.  I

5 feel so sorry.  My behavior has already been punished.

6 I'm guilty and I'm willing to bear the responsibility.

7 And I wish the Courts will consider release as well as my

8 family's situation will be lenient when you give

9 treatment.  And when I go back to China I will tell all my

10 family and myself and my friends and people that if you

11 want to do business that you have to understand American

12 laws and you have to obey American laws.  I beg the Court

13 to consider time served of incarceration so that I can

14 return to my family and be useful to society and better

15 society.  Thank you so much.

16          THE COURT:  Thank you, sir.  Okay.  The

17 Court is again going to take a relatively brief recess to

18 consider Counsel's argument and consider the proffers

19 submitted to the Court before I impose sentence.

20          MR. GADDY:  Judge, Can Mr. Qi be

21 released?

22          THE COURT:  Yes.  And then again, with

23 regard to the record as part of the plea agreement, I

24 don't know was Mr. Qi also with regard to Count II?

25 Because that wasn't made on the record, I don't believe it

89

```
 1    made on the record in terms of that being dismissed as it

 2    relates to Mr. Qi.

 3                   MR. CASEY:  Your correct.  The

 4    government moves to dismiss Count II on Mr. Qi.

 5                   THE COURT:  Okay.

 6                   MR. GADDY:  And Your Honor, just real

 7    brief, I wanted to on the record to thank the government,

 8    the agents have been wonderful to work with them.  And I

 9    want to thank the Court again.  Thank you.

10                   THE COURT:  Okay.  Thank you.

11              (THEREUPON, a short recess was had; WHEREUPON,

12    the following proceedings were had.)

13                   THE COURT:  Okay.  Mr. Huang, before the

14    Court imposes sentence in this matter, I do have a few

15    comments I would like to make.  As you are aware and as

16    you heard Counsel eluded to, it is the job of this Court

17    to impose a sentence that is sufficient but not greater

18    than necessary to comply with the provisions set forth in

19    18 U.S.C.§ 3553.  In doing so obviously the Court

20    considers the advisory guidelines.  The Court considers

21    the 3553 factors.  The Court considers the PSR, argument

22    of Counsel.  I know that there were many exhibits

23    proffered to the Court, and the considers that.  And any

24    comments you make to the Court, the Court takes all that

25    into consideration in it's attempt to comply with the
```
90

1    provisions of the statute.

2           With regard to your argument or your Counsel's

3    argument in request with respect to your sentence, there

4    is very little that the Court may disagree with your

5    Counsel on.  The Court had the opportunity to reflect and

6    understands the family back in China, in particular your

7    dad who is ill.  The Court has considered the argument

8    with regards to your status if the Court imposes sentence

9    above a certain amount, the representations that your

10   Counsel made with respect to that.  The Court has

11   considered the imposition of any sentence and the effect

12   and the argument your Counsel has made with respect to

13   institutions able to meet even your basic needs with

14   regard to the language barrier.  The Court recognizes your

15   lack of criminal involvement in the past.  The Court

16   further recognizes, I think in part, the Court recognizes

17   and to some extent appreciated your comments that you made

18   with respect to -- and I think it goes to the factor of

19   deterrence.  That it would be your thought that you go

20   back, when you go back to alert others that the conduct in

21   which you involved yourself in is criminal in the United

22   States.

23          On the end, I do concur with the government in

24   this respect.  I think this crime which you have pled

25   guilty to, I think the most important factor is that of

                              91

deterrence.  I think and I agree specifically and I think

2   generally.  I think generally in the sense that the Court

3   needs to fashion or have a sentence that puts some notice

4   to others that if you involve and commit these types of

5   crimes, there is a consequence for it.

6              I think also with regard to you Mr. Huang

7   specifically deter what singularly is business practice to

8   exploit companies many of which you did business here in

9   the United States.  The Court does not -- and I know the

10  argument was made with respect to -- and I treat that and

11  I really look at that in terms of disparity.  I don't see

12  the disparity as it relates to Mr. Qi.  I think clearly by

13  the record and everything the Court has reflected it is

14  clearly different.  Mr. Qi is not similarly situated than

15  you.  The fact that he got probation the Court recognizes

16  by the record what his role was in it.  So with regard to

17  disparity in sentence what the Court could impose in this

18  case, I don't see it.  And I don't think the record, upon

19  review of the record, and closer review of the record

20  suggests that Mr. Qi was similarly situated than you.

21  Other than to act as, which was the Court's understanding

22  part of this plea agreement that the Court took, act as

23  interpreter.  Clearing knowing what he was doing, however,

24  but significantly different role.

25              Is there any good reason why the Court should

```
 1    not impose sentence at this time?

 2                    MR. CASEY:  None from the United States,

 3    Your Honor.

 4                    MR. HOBBS:  No, Your Honor.

 5                    THE COURT:  Mr. Huang it is the position

 6    of this Court that you are hereby committed to the custody

 7    of the Bureau of Prisons for a period of 18 months in

 8    Count I of this two count indictment.

 9         The Court believes that this sentence in the

10    Court's opinion, that one, that reflects the seriousness

11    of the offense.  The Court believes this will promote

12    respect for the law and as the Court mentioned I think it

13    will thwart adequate deterrence to others.  Generally, and

14    I think more specifically as it relates to you.  And I

15    think this sentence is one that is sufficient but not

16    greater than and in compliance with the statute.

17                    Further, sir -- can I have counsel approach?

18                    (THEREUPON; Counsel approached the bench and the

19    following proceedings were held.)

20                    THE COURT:  As a practical matter it is

21    difficult for me to address.  In terms of supervised

22    release, is it any difference because if his status is --

23    or is it something the Court need not --

24                    MR. CASEY:  Your Honor, if you want to

25    impose, you know, supervised release until he leaves the
                              93
```

```
1   country after seven days or something like that.
2                    THE COURT:  I don't know if it is
3   significant.  I don't know if I must.  There is a minimum
4   or does that even have --
5                    MR. HOBBS:  First of all, Judge, I don't
6   think, if you look at the back of the PSR there is no
7   statutory required minimum.  They are some guideline
8   minimums so I think --
9                    THE COURT:  Because it appears that if
10  he's released he may be dealing -- and I just don't know
11  some immigration so I just don't know.  You know, I don't
12  know where that will fall.  My thought was not to impose
13  because at that point in time I would suspect there will
14  be deportation proceedings whether I put him in custody or
15  whether I didn't.  Is that right?
16                   MR. CASEY:  Yeah, I have no objections
17  to that.
18                   THE COURT:  Okay.  Okay.
19                   MR. HOBBS:  And Judge, we might as take
20  up now, we are going to ask for voluntary surrender.
21  Approximately sixty days.
22                   THE COURT:  Okay.
23                   MR. HOBBS:  I just wanted to let you
24  know.
25                   THE COURT:  Okay.  Yeah.  And also on
                              94
```

```
 1    the record just ask I know you want him placed in an

 2    institute in terms of the northeast.

 3                    MR. HOBBS:  Yeah.  I will.

 4                    THE COURT:  Okay.  Okay.

 5            (THEREUPON; The proceedings returned to open

 6    Court.)

 7                    THE COURT:  Okay.  And the Court will

 8    not order supervised release to follow.  The fine of

 9    $250,000.00 dollars will be imposed.  And if there is no

10    objection I believe -- Counsel was there a bond currently?

11                    MR. HOBBS:  Yes, yes.  There is a

12    $100,000.00 dollar bond we would ask to be used for

13    partial satisfaction.  And we have an additional check for

14    $150,000.00 and we have already tendered the $100 dollar

15    special assessment.

16                    THE COURT:  Okay.  And that will be

17    applied to the following post by the Court.

18            Further, the Court will, again, the preliminary

19    order of forfeiture is finalized at this time.

20            Further, it is order -- and my understanding

21    that Mr. Huang has already paid but a $100 dollar special

22    assessment which will be due immediately.  My

23    understanding is that he has paid that assessment.

24            Mr. Hobbs, do you want to make a further record

25    or request of the Court?
                              95
```

1            MR. HOBBS:  Yes, Judge.  Three issues,

2    Judge.  First, we would ask that the judgment commitment

3    order will reflect the following recommendation.  It is

4    recommended that the Bureau of Prisons the defendant be

5    placed in a facility with a Mandarin Chinese speaking

6    staff member.  And if none are available, then in a

7    facility with the Mandarin Chinese speaking population.

8            Secondly, Judge, we ask that the Court allow for

9    a voluntary surrender date of approximately 60 days.  It

10   is our experience that this period of time is necessary to

11   find a designated facility and I speculate that that will

12   be especially true in this case.  I just proffered for the

13   record, Judge, that the entire period supervised

14   supervision even during the period of time when he was on

15   home monitoring he never had any violations and never

16   tried to evade the country.

17           The final request, Judge, is that I note that

18   our interpreter needs to leave for the airport at 2:45.

19   I'm just advising you that I would have Ms. Yi Sun, who is

20   co-counsel and also fluent in Mandarin go with my legal

21   assistant to the third floor of the Marshall's office and

22   explain to the Marshall that she needs to be able to

23   interpret for the self-surrender card.  Typically the

24   Marshall's office will bring a client into custody and the

25   lawyers are kept outside.  And so there is no confusion I

                              96

```
1    will have the Marshall's office call you and I'm asking

2    your discretion to allow that.  Whatever impact you have.

3    I know the Marshall's determine their own procedures, but

4    I think under the circumstances we need to get a

5    self-surrender card with the assistance of Ms. Sun.

6                    THE COURT:  That's fine.  If that is the

7    case, just call up to chambers.

8                    With respect to the voluntary surrender date, is

9    there any objection from the government?

10                   MR. CASEY:  Your Honor, it's been my

11   practice to, but in this case I won't because he has been

12   compliant.  I don't think that it will make a difference

13   if I do make an objection so no objection, Your Honor.

14                   THE COURT:  Okay.  Well, I wanted to

15   give you the opportunity, Counsel.

16                   MR. CASEY:  Thank you.

17                   THE COURT:  So the voluntary surrender

18   date will be March the 29th, at 2 o'clock.  And the Court

19   will also include in the judgment an institution where

20   Mandarin is spoken.  I make sure we make a record of that

21   and we will get that in the judgment.

22                   MR. HOBBS:  If it helps the Court it is

23   on page 30 of the sentencing memorandum.

24                   THE COURT:  Okay.  Thank you.

25                   Mr. Huang, at this time both the government and
                                   97
```

```
1   the defendant you are advised of your respective rights to

2   appeal.  What the Court has done here today you can do so

3   pursuant to 18 U.S.C.§ 3742.  But only to the extent that

4   it wasn't waived in the plea agreement.  You can loss your

5   right to an appeal if you don't timely do so.  If you

6   don't timely file your appeal here in District Court,

7   Federal rules of criminal procedure give you 14 days after

8   entry of judgment to file a notice of appeal on your

9   behalf.  If you are unable to pay the cost of the appeal

10  you have the right to apply for leave to appeal in forma

11  pauperis.  With that said, is there anything else for the

12  record?

13              MR. CASEY:  Your Honor, just for the

14  record, I wanted to dismiss Count II or move to dismiss

15  Count II with regards to Mr. Huang.

16              THE COURT:  Okay.  And that will be

17  noted.

18              MR. CASEY:  Nothing else from the United

19  States.

20              THE COURT:  Thank you.  Okay.  Anything

21  from the defense?

22              MR. HOBBS:  No, Your Honor.

23              THE COURT:  Okay.  Thank you, Counsel.

24  That will conclude the hearing.

25              Well, Counsel.  Mr. Hobbs, and I don't know as a
```
                                98

1    practical matter the probation officer -- I know

2    throughout this there was an issue with the visa expiring?

3                    MR. HOBBS:  Right.  That's February

4    27th.

5                    THE COURT:  Will there be an -- and I

6    don't know.  Would that effect with me setting the

7    self-surrender?

8                    MR. HOBBS:  Well, what could happen,

9    Judge, is and Mr. Versseld has explained this in our

10   sentencing memo.  And again, he has a lot of experience

11   when it comes to immigration, Judge.  Once you over stay

12   your visa that is going to be a separate issue that ICE

13   could apprehend him on.  Mr. Versseld is going to try and

14   avoid that.

15                   THE COURT:  Okay.

16                   MR. HOBBS:  If there is an issue we will

17   bring it to the Court's attention.

18                   THE COURT:  Okay.

19                   MR. HOBBS:  I think Mr. Versseld would

20   say, Judge, that his hope is that ICE will honor the

21   Court's sentence.

22                   THE COURT:  Okay.  Right.

23                   MR. HOBBS:  And his experience has been

24   that typically ICE will do that.  And so if he explains

25   that he is on self-surrender, while they legally could
                             99

```
 1    take him into custody once he over stays his visa status

 2    as a separate issue from aggravated felony.

 3                    THE COURT:  Okay.

 4                    MR. HOBBS:  And he is hopeful that that

 5    will not happen.  If it does, we'll bring it to the

 6    Court's attention and deal with it then.

 7                    THE COURT:  Well, thank you.  I've been

 8    getting more and more issues with ICE.

 9                    MR. HOBBS:  Right.

10                    THE COURT:  And I don't know if I should

11    worry about it, you know, there is just so much that goes

12    on and it effects how I can, you know, there are tension

13    hearings and, you know, it is frustrating from my

14    standpoint at least.

15                    MR. HOBBS:  And right.  Ideally, Judge,

16    if we had a designated facility within February 27th date

17    --

18                    THE COURT:  Right.

19                    MR. HOBBS:  -- that we can go to, but

20    typically it doesn't occur that quickly.

21                    THE COURT:  Right.

22                    MR. HOBBS:  And particularly given the

23    Mandarin issue, I don't think it will.

24                    THE COURT:  Right.

25                    MR. HOBBS:  But we will keep the Court
                              100
```

1    informed.

2                    THE COURT:  Thank you.  I appreciate it.

3    Thank you.

4             (THEREUPON, the following proceedings were

5    adjourned.)

6

7                        CERTIFICATE

8         I certify that the forgoing is a correct

9    transcript from the record of proceedings in the

10   above-entitled matter.

11

12   March 28th, 2013

13                         /s/  Denise C. Halasey
                           Denise C. Halasey, CCR
14                         U.S. Court Reporter

15

16

17

18

19

20

21

22

23

24

25
                            101